(No. 22635.—

IN RE J. W. HORWITZ, Attorney, Respondent.

*Opinion filed April 12, 1935—Rehearing denied June 5, 1935.*

STONE and ORR, JJ., specially concurring.

HOBART P. YOUNG and CHARLES P. MEGAN, *amici curiæ.*

MORSE IVES, for respondent.

Mr. JUSTICE SHAW delivered the opinion of the court:

On March 2, 1933, the Zurich General Accident and Liability Insurance Company filed a complaint against the respondent with the committee on grievances of the Chicago Bar Association. It was signed by A. D. Owen, superintendent of the Chicago claim department of that company and charged substantially the facts set forth in the following summary of the evidence submitted to us:

A. D. Owen testified that in his position as superintendent of claims for his company he became suspicious of an adjuster in its employ and decided to test his honesty; that he determined to put through a fictitious case, giving the name of a supposedly injured party to be impersonated by a detective and find out what the adjuster would do. Pursuing that idea he employed a private detective by the name of Louis Baer. He then went to a minor employee of a Chicago newspaper which was a policy holder in the Zurich Company and arranged for him to mail in a report of an accident supposed to have occurred wherein a newspaper truck hit the detective, Baer. Owen prepared an accident report, and the employee of the insured, apparently without any consent of his superior officers, mailed it to the insurance company. This fictitious case was assigned to the adjuster exactly as though it had been an actual occurrence. The report stated that an accident had taken place on June 6, 1932, at 8:15 P. M., at Oakdale and Broadway, in the city of Chicago; that the truck was traveling north on Broadway and another car was coming west on Oakdale without lights, and that the driver was watching the other car and did not see the injured man until he was practically on top of him. The name of the driver was given as R. Walder, the injured as Louis Baer, and the injuries were stated "fell to street; tried to get him to go to doctor, but man who said he was a friend of his said he would take him in his car; name

of doctor unknown." The adjuster was instructed to investigate the case, to check the injuries and disability and to get a medical examination. The instructions ended with the words, "Liability case.—A. D. O.," the initials being those of Owen. At the same time Owen caused an entirely fictitious and fabricated report of an accident to be made out, with the name "Anthony Walder" signed to it. This gave full details and particulars of how the fictitious accident was supposed to have happened, and was put in the files for the adjuster to see, as Owen said, in order to prevent the adjuster from checking up on the driver and discovering that, in fact, there had been no accident. Owen further testified that, pursuant to instructions, the adjuster called upon the detective, who throughout the transaction played his part of an injured person, and that the adjuster's report, which was introduced in evidence, showed the detective had told the same story as to how and when the accident happened as was shown by the fictitious report in the files. The adjuster reported that he had been unable to get a settlement of the case because the injured party wanted to talk to some of his children first. In his report he stated that "Mr. Baer is a Jew, and my first impression was the lowest kind of a 'Kike.' I have not changed my impression." Following the adjuster's visit the detective reported to his employer that he had told the adjuster that he had a serious head injury and believed that he had a skull fracture and also an injury to his spine. Shortly thereafter the respondent appeared in the case as attorney for the injured party, having sent a notice of attorney's lien to the newspaper. Owen testified that he then accused his adjuster of complicity with the respondent, and that the adjuster confessed to him that he had "tipped the case off" to the respondent, and that on two occasions he had received money from him, in one case $20 and in another $60. Most of the testimony in this connection is entirely incompetent, dealing with con-

versations and acts between the witness and his employee out of the presence of the respondent and strictly *res inter alios acta.*

The witness Owen further testified that after he knew the respondent, Horwitz, was in the case he instructed the detective to continue the deception, for the purpose, as he said, of trying to find out how far Horwitz would go; that he had many conversations with the respondent in which he asked $5000 in settlement, and in which, for his first offer, the witness suggested $500 as a suitable sum, and that in his opinion the case would never be worth more than that. By a trick, which will be hereinafter mentioned, the witness obtained from Horwitz the statements of the doctors who had examined the detective, copies of their reports and certain X-ray pictures. The doctors' reports, which were introduced in evidence, were as follows: The report of Dr. F. E. Deadman was that he had made an X-ray examination of the detective; that he had found some evidence of a skull fracture, manifested by a positive Romberg test; a marked scoliosis in the lumbar region, with curvature to the left; muscles tense and spastic in the back and movements restricted. The report gave it as the doctor's opinion that there was a slight fracture of the articular process of the fourth lumbar vertebra. He recommended that the patient should wear a cast for a time and that possibly he might be later fitted with a Taylor spine-brace. The report of Dr. Fred F. Schwartz indicated a rotation and displacement of the fourth lumbar vertebra; a fracture of the right inferior articular process of the fourth lumbar vertebra, and that there was a line on the X-ray picture which would justify a diagnosis of skull fracture. The report of Dr. N. B. Lans was to the effect that he had been called to see the supposedly injured man "on or about" June 6, 1932, for the purpose of treating him, as he was told, for injuries sustained when struck by a truck at Oakdale avenue and Broadway; that the patient

complained of severe pain in the lower part of his back and in the back of his head; that there were contusions in the left occipital region, with marked swelling and tenderness; that the patient was badly dazed; that there was an injury to the back and lumbar spine which he thought might cause the complaints as to extreme pain and tenderness. He stated it to be his opinion that the man had sustained an injury which would prevent him from returning to any form of manual labor. It should be noted in connection with these reports that the original X-ray films were certified to this court, and there is also a copy of one of the X-ray pictures in the record which shows, even to the untrained eye, a marked curvature of the lower spine and a peculiar twist to one of the vertebræ.

The witness Owen testified that the foregoing statements of physicians were presented to him for the purpose of substantiating the claim of injury; that in order to try and get these reports he had instructed the detective to discuss settlement with Horwitz, and that a final figure of $1750 was arrived at; that after arriving at this figure Horwitz brought the original doctors' reports in, with the releases that had been signed; that the witness then adopted the trick or device of pretending to draw up the draft; that he asked Horwitz for the reports, which were readily produced and handed to him; that he thereupon pretended that someone wanted him out in the hall and went out to where he had a man waiting, to whom he gave the reports and instructed him that they be immediately photographed; that he talked with Horwitz about various matters, detaining him long enough to permit the pictures to be taken, and after he secured the evidence he wanted he told Horwitz he was sorry but his superior officer would not permit him to make the settlement; that Horwitz told him he would be sorry, because in his opinion the case was worth much more than $1750 and that he would start suit. Suit was later actually started by the respondent.

On cross-examination Owen testified that he had dealt with Horwitz in many cases, and that as far as he knew personally, Horwitz had always dealt fairly.

The adjuster who was being trapped by this proceeding testified that he had notified Horwitz's office about the case, and that on two occasions he had received money from Horwitz, at one time $20 and another time $60. Neither he nor Owen testified that the Zurich Company had ever received any detriment from any dealings with the respondent, nor is there anything in the record to indicate any biased, unfair or dishonorable conduct in connection with any of the cases mentioned.

Dr. Charles Frazier, a physician in the employ of the Zurich Company, testified that he examined the detective who was supposed to be injured, in the presence of Dr. Lans and a brother of the respondent. His report is in the files and indicates that he had no knowledge of the fictitious nature of the case but supposed he was examining a real patient who had sustained a real injury. His report shows that the detective told him about the accident and how he was knocked down by the truck; that the detective claimed to have a skull fracture, and that the X-ray showed a line or shadow which might be interpreted as a skull fracture if the medical witness was not too particular regarding his statements but which in the witness' opinion as a doctor did not indicate a fracture at all. He described it as a very fine and more or less interrupted shadow line, which in his opinion was the result of normal bone markings. His report stated: "The injured man complained of dizziness after the accident. His insistence and manner in which he told the story indicate that it had been suggested to him by someone. The general nervous findings are normal. As is generally the case in a malingering individual, he was rather tense during the examination. He indicated the top and back of the shoulder as having been injured. The examination, however, was totally neg-

ative." The doctor gave it as his further opinion that the back deformity was old and not new. He stated in his report that there existed a moderately pronounced left lateral curve and some rotation of the bodies of the third, fourth and fifth vertebræ, and that the deformity is very readily visible. He said "there are present the usual numerous shadows of various sorts characteristic of this rather complicated bony structure, permitting false interpretations as regards injury." He further stated in his report: "I have always found Horwitz fairly reasonable concerning his views in these cases and not inclined to viciously or boldly magnify conditions. I have no doubt this man was injured."

The detective, Baer, testified to having been employed on the case through Cornelius Burns, who operates a small detective agency. He told of the instructions which he received and the fiction he was to enact, and that he was to pretend that the accident had happened as above outlined in Owen's testimony. He told of the adjuster calling and of his conversations with him and that he had refused to accept $100 in settlement. He then testified that a man named Ingram called to see him, leaving a card showing him to be a contractor and builder with offices in the Otis building, and stated that Ingram told him that Horwitz was a good lawyer, who could get him as much as $4000 for his injuries. The telephone number on the card was identical with that of Horwitz, Ingram sub-letting office space in Horwitz's office. The detective further testified that he thereafter called Horwitz on the phone and asked him to come and see him, which Horwitz did; that he gave Horwitz a power of attorney to represent him, and that Horwitz told the witness he had a good case; that the liability appeared to be absolute, with nothing involved but the nature and extent of the injuries. He first testified that he told Horwitz he was not injured, in fact, and that he had no witnesses, but on cross-examination he admitted that he had not told Horwitz he was not injured

but had, in fact, given Horwitz a full statement of the injury, identical with that fabricated by the manager of the Zurich Company, which Horwitz's assistant wrote down; that he had also told Horwitz that a man by the name of Nelson was a witness to the accident, and that he would not give him the name of his doctor because, as a matter of fact, the doctor was an interne not licensed to practice, and he was afraid he would get the young man into trouble; that Horwitz thereupon called up Dr. Lans on the telephone, explained the case to him, and requested him to take the case and to make it appear that he had first seen the patient on the sixth of June, explaining over the telephone the reason for ante-dating the report was to keep the supposed, but in fact non-existent, young interne out of trouble. It is entirely clear from the cross-examination of this witness that he definitely and intentionally misled the respondent. He signed an employment contract with the respondent for a contingent fee of one-third of the recovery, and on the back of that contract was set forth in writing an outline of the manner in which the accident was falsely claimed to have occurred. Without going further into the testimony of this witness as to facts which were covered by the testimony of other witnesses, it is sufficient to add that he never did tell the respondent that Nelson was not a genuine witness to the accident, and that he "stalled" off signing the releases for a less sum than $2000 because he had orders from his employer not to sign them for a while, and that he put the matter off by telling Horwitz that his sons did not want him to sign and had told him to wait.

Certain court reporters testified that on the night of October 11, 1932, they were concealed in the detective's home and took down, in short-hand, conversations between the respondent, the detective and Mrs. Baer. This was after the photostatic copy of the release and the doctors' reports had been obtained from Horwitz by the trick above

mentioned, and after Horwitz, still believing the case to be genuine, had started suit. The substance of the conversation between these parties was as follows: The detective told Horwitz he was afraid he could not go through with actually testifying; that he did not consider himself really injured; that he would feel like a fool going to court and that he was worried about it. At one point he said: "Well, I wanted to tell you I did not like the idea of testifying. As far as saying I was actually injured I would say that." At another point he said: "I thought before I would go ahead I would tell you I am a little bit afraid of taking the witness stand and go through that part of testifying." To this Horwitz replied, "Well, why didn't you talk to me before like that?" The respondent assured the detective that he did not think any testimony would be necessary and the case would eventually be settled; that even if Baer did have to testify, inasmuch as the liability was practically admitted, it would be nothing but a fight between the doctors as to the extent of the injuries. He explained to Baer that Owen had been put in a bad position by his superior officer refusing to approve the settlement which had been agreed upon, and plainly indicated in this eaves-dropped conversation that even then he did not realize or know that he had been tricked. Neither was he told then or at any other time that there had not been an accident in which the detective was knocked down by a truck.

For the respondent, Dr. Lans testified that he was a cousin of an attorney who worked in the respondent's office; that he had met Horwitz once before but had never handled any cases for him; that when he was called to see Baer he was given the history of an accident as above set forth; that Baer complained of severe pains in his back and head, that he had difficulty in turning over in bed, that he was dizzy and had severe pains in the muscles

of his left side; that the witness applied temporary remedies, such as hot-water bottles, suggested the necessity for X-rays, and recommended Dr. Schwartz. He testified further that he had later gone with the detective to the office of Dr. Schwartz, where it was necessary for that doctor, himself and a nurse to give considerable assistance in getting the patient on the X-ray table; that the detective pretended to have difficulty in walking and had to be helped in and out of an automobile; that the X-ray indicated spasticity of the muscles, scoliosis of the spine and an apparent fracture of the fourth lumbar vertebra. The doctor admitted that he had ante-dated his report for the purpose of protecting the supposed interne, and contended that it was a totally immaterial matter, as the injuries, if any, were of a permanent character and the exact date of his first treatment of no importance. Ruth LeFever, office assistant to Dr. Schwartz, testified to the X-ray examination, the patient's apparent pain and suffering and his difficulty in getting about. Dr. Potter, Dr. Schwartz and Dr. Deadman all testified for the respondent as to the X-ray findings, the apparent injury and the complaint made by Baer.

Ben F. Cohn, a lawyer, one of Horwitz's assistants, testified to being present when the contingent contract was signed and identified it with its signatures. He also testified to the story told by Baer as to the manner in which he was injured, the name of the witness given by him, and to the correctness of the notes as to the accident, made by him on the back of the contract.

The respondent produced five witnesses who testified to his good reputation as a lawyer and a citizen, one of them being an assistant superintendent of the Chicago claim department of the London Guaranty and Accident Company, and another being a lawyer in Chicago describing himself as special counsel and general supervisor for the claim department of the Yellow Cab Company.

Respondent testified in his own behalf. From his testimony it appears that he has been practicing law in Chicago since 1916, specializing in personal injury and compensation cases; that he went to the home of Baer in response to a telephone call from Baer, and that he largely did so because Baer said that he was Jewish, as is the respondent, and that it was represented to him that Baer was a poor man and unable to come to the office; that the witness knew Stoup as an investigator for the Zurich Company but had never had any business with him of any kind; that he had handled hundreds of cases with the Zurich Company during his practice; that he had done business with five other adjusters for that company but had never had any contacts with Stoup except that at one time in the early part of 1932 Stoup had called to see him about a small case, but that no settlement was made, it being later adjusted by another representative of the Zurich Company. He denied ever giving Stoup any money for any purpose. He further testified that when he called upon Baer the detective told him that he had been struck by the newspaper truck, which was crossing the street against the light and on the wrong side of the street, knocking him down; that Baer said he had struck his head on the pavement, and that he had been assisted up by a man named Nelson, who took him home; that Baer told him that a relative of his who was an interne and not licensed to practice medicine was looking after him, and that the interne had told Baer he had a skull fracture and a broken back; that the witness told Baer that if he had a skull fracture he would not be sitting up, and told him to forget about having a skull fracture; that he might have a concussion, which would be just as bad, but that he did not have any fracture. The witness asked Baer for the name of the interne, but he would not give it because he said he had to protect him and keep him from being barred from getting his license; that Baer claimed that since the time of

the accident he had been unable to sleep on account of tremendous headaches and pain; that he had had certain other glandular trouble; that while he was questioning Baer, the assistant, Cohn, was taking down the facts and filling out a power of attorney, some of the facts appearing on the face of that power of attorney; that he told Baer that he did not know of a doctor who would take the case, but that Cohn suggested his cousin, and he called him on that suggestion; that Baer stated he had no money to pay the bill, but that the witness told him that as long as there was an insurance company behind the case and it was obviously one of certain liability he need not worry about the doctors' bills; that he had no knowledge that there was any lack of genuineness about the case, and never did know that Baer was a detective and was not injured until he learned the fact through his own detectives, four weeks after the complaint came in to the bar association. The witness testified that he had a number of talks with Owen and finally got from Owen an offer of $1750 to settle the case, and that during all of these negotiations Baer was constantly calling him and urging that a settlement be arrived at. He told about the interview with Owen in which the documents were photostated without his knowledge, about actually starting suit on the case, and about a dismissal being taken on signature of his supposed client without his knowledge after the suit was started.

A. D. Owen was called for further cross-examination, and admitted that his offer of $1750 in settlement amounted to a representation to Horwitz that the case was genuine. There is much other evidence in the record, but these are substantially the facts upon which we are urged to disbar the respondent.

From the evidence before us we have drawn the following conclusions: It is probable that the witness Stoup, the adjuster, informed someone in the respondent's office that Baer had a case involving liability; that Ingram so-

licited this business for the respondent, although there is no proof that it was at the respondent's request and may possibly have been as a matter of friendship for him; that the respondent wrongfully induced Dr. Lans to report that he had Baer's case from the date of the fictitious accident, but that this action on his part was prompted and induced by Baer's false story about an unlicensed interne, and that his action in that respect may as fairly be attribued to a desire to protect this young man as to any desire to defraud anyone, the date being more or less immaterial; that Baer at all·times claimed to have been injured by being knocked down by a truck, and that he never denied the fact of the accident to the respondent, although at times, when talking for the benefit of concealed witnesses, used such expressions as "you know I am not injured;" that at these same times and in these same conversations the detective protested that $1750 was not enough for a settlement, thus creating an equivocal, and for the respondent a non-understandable, situation; that these statements were attributed by the respondent to the detective's reluctance to testify, and were, in fact, so understood by him; that the detective not only falsely represented to the respondent that he had a very real accident but gave him the name of a witness to it; that the detective had a physical deformity of the spine which is conclusively shown by the X-rays, as well as a line or shadow in the X-rays which could be interpreted as a skull fracture; that the respondent in good faith attributed these X-ray showings to the accident; that the attitude and conversations of Owen in offering settlement amounted to an active representation on his part that there had been an accident as claimed, and that the principal, if not the only, question at issue was the nature, character and extent of the injuries, and that the respondent was directly drawn into the case by a request from Baer that he call on him. We further conclude that the respondent at all times believed that there had been an

actual accident as claimed, and that he never had any reason to think otherwise until this proceeding was started against him.

If this entire record is interpreted most strongly against the respondent it falls short of sufficient ground for disbarment. He was entrapped by a set of false and carefully arranged circumstances and evidence sufficiently valid, and apparently real, to deceive an experienced practitioner. Concerning entrapment this court has said: "To stimulate unlawful intentions for the purpose and with the motive of bringing them to maturity so the consequent crime may be punished is a dangerous practice. It is safer law and sounder morals to hold where one arranges to have a crime committed against his property or himself, and knows that an attempt is to be made to encourage others to commit the act by one acting in concert with such owner, that no crime is thus committed. The owner and his agent may wait passively for the would-be criminal to perpetrate the offense, and each and every part of it, for himself, but they must not aid, encourage or solicit him that they may seek to punish." *Love* v. *People,* 160 Ill. 501.

In the recent case of *Sorrells* v. *United States,* 287 U. S. 435, 77 L. ed. 413, 53 Sup. Ct. 210, which is also reported in 86 A. L. R. 249 with an extensive note, the distinction is there clearly made between what may and what may not be done by way of entrapment. It is there held that the officers of the government may afford opportunities or facilities for the commission of crime and that artifice and stratagem may be applied to catch those who are actually engaged in criminal enterprises. It was held, on the other hand, that entrapment constitutes a valid defense if the officers of the law inspire, incite, persuade or lure the defendant to commit a crime which he otherwise had no intention of committing. The court quoted with approval the statement of Judge Sanborn in the case

of *Butts* v. *United States,* 273 Fed. 38, as follows: "The first duties of the officers of the law are to prevent—not to punish—crime. It is not their duty to incite and create crime for the sole purpose of prosecuting and punishing it. Here the evidence strongly tends to prove, if it does not conclusively do so, that their first and chief endeavor was to cause—to create—crime in order to punish it, and it is unconscionable, contrary to public policy and to the established law of the land to punish a man for the commission of an offense of the like of which he had never been guilty either in thought or in deed, and evidently never would have been guilty of if the officers of the law had not inspired, incited, persuaded and lured him to attempt to commit it." By the majority opinion, written by the chief justice, the judgment was reversed without remanding the cause, upon a theory of construing the statute so as not to include the cases of entrapment. In a special concurrence in the result, written by Mr. Justice Roberts and concurred in by Justices Brandeis and Stone, the same result was reached but by placing it upon the simpler ground that courts should be closed to and refuse to entertain such cases on grounds of public policy. Mr. Justice Roberts said: "There is common agreement that where a law officer envisages a crime, plans it and activates its commission by one not theretofore intending its perpetration, for the sole purpose of obtaining a victim through indictment, conviction and sentence, the consummation of so revolting a plan ought not to be permitted by any self-respecting tribunal. Equally true is this whether the offense is one at common law or merely a creature of statute. Public policy forbids such sacrifice of decency. The enforement of this policy calls upon the court, in every instance where alleged entrapment of a defendant is brought to its notice, to ascertain the facts, to appraise their effect upon the administration of justice, and to make such order with respect to the further prosecution of the cause as the circumstances require."

For the lawyer in active practice real temptations are plentiful and sufficient without their artificial multiplication by private parties whose real motives can with certainty be known only to themselves. The lawyer must deal with exaggerations, fraud and actual perjury day after day, and occasionally these things come from his own clients without his knowledge or consent. His path is hazardous at best, and if he can so far avoid its natural pitfalls as to maintain and be able to prove a good reputation it should be sufficient to protect him against plots and schemes. This court will not countenance trickery and deceit such as this record discloses, much less will it grant consummation thereof by disbarring the respondent.

The proceedings will be dismissed.

*Proceedings dismissed.*

STONE and ORR, JJ., specially concurring: We agree with the result reached but not with all that is said in the opinion.