[L.A. No. 30076. In Bank. Apr. 19, 1973.]

FRANK M. PATTY, Plaintiff and Respondent, v.
BOARD OF MEDICAL EXAMINERS, Defendant and Appellant.

COUNSEL

Evelle J. Younger, Attorney General, and John M. Huntington, Deputy Attorney General, for Defendant and Appellant.

Allan F. Grossman for Plaintiff and Respondent.

Ellis J. Horvitz as Amicus Curiae on behalf of Plaintiff and Respondent.

OPINION

TOBRINER, J.—In this case we must determine whether the defense of entrapment is applicable to a disciplinary proceeding of the Board of Medical Examiners of the State of California (hereinafter "Board"). After unsuccessfully asserting such an entrapment defense in an administrative hearing before the Board, plaintiff, Dr. Frank Patty, sought review of the administrative decision by writ of mandate in the superior court. (Code Civ. Proc., § 1094.5.) Upon conducting an independent review of the evidence, the trial court sustained the doctor's challenge to the Board's decision, concluding both that the defense of entrapment is generally available in administrative disciplinary proceedings and also that, under the facts of the instant case, Dr. Patty had indeed been entrapped by the investigators of the Board. The Board now appeals from the adverse judgment of the superior court.

For the reasons discussed below, we affirm the trial court judgment. As

we point out, the majority of our sister states which have passed on the legal question at issue recognize entrapment as a defense in administrative disciplinary proceedings, and we have concluded that this weight of authority rests on a firm foundation of sound public policy. As we shall explain, the purposes underlying the recognition of an entrapment defense—the preservation of the dignity of the legal process and of public confidence in it—are as applicable to the conduct of administrative proceedings as to criminal trials; administrative officials, no less than police or other law enforcement officers, subvert the fair administration of justice when, instead of pursuing legitimate methods of prevention and detection of crime, they apprehend wrongdoers through schemes designed to foster or induce the commission of criminal conduct. Accordingly, we now hold that an individual may raise the defense of entrapment in an administrative proceeding at which his right to practice a profession or business is at stake.

We further conclude that in the instant case the trial court's finding that Dr. Patty was in fact entrapped is supported by substantial evidence and must be sustained. Although the evidence before the Board discloses a series of occasions on which plaintiff, in the absence of a proper medical basis, prescribed restricted drugs for several ostensible "patients," the record also reveals that prior to the time Dr. Patty was solicited by the Board's undercover investigators, the physician's professional record had been exemplary. Based on the investigators' own extensive testimony of their operating tactics, discussed below, we believe the trial court could properly find that plaintiff was lured into his course of unprofessional conduct by state agents and that the doctor had no preexisting intent promiscuously to issue prescriptions for restricted drugs. Under these circumstances, the trial court's decision must be sustained.[1]

We begin with a short history of Dr. Patty and of the facts of the case. Dr. Patty, 59 years of age, was the first black graduate of his medical school, receiving his license to practice in 1951. Prior to the acts which are charged against him in the instant case, no disciplinary action of any kind for unprofessional conduct had ever been brought against him; indeed, his professional activities over his lengthy career had been in all respects exemplary. As of the date of the trial court's decision, Dr. Patty was on the staff of the Hollywood Community Hospital, Community Hospital of Los Angeles, and Los Angeles County Hospital. His record of good works

---

[1]Because the Board's decision rests solely on evidence procured by entrapment, we need not consider plaintiff's numerous alternative contentions involving alleged errors in the administrative proceedings and abuse of administrative discretion in the severity and ambiguity of the Board's disciplinary order.

in the community included volunteer service to the Y.M.C.A. and active participation in the affairs of his church.

Shortly after January 1, 1968, Xavier Suazo, an investigator for the Board, received a complaint that Dr. Patty had been prescribing unusually large amounts of narcotics to an elderly patient. An investigation of local, state and federal narcotic bureau files and local pharmacy records proved the complaint to be false. Nevertheless, calling upon Patricia Wolf (a sometime "actress, model and hostess") and her roommates, who were his part-time investigators, Suazo pursued further the possibility that Dr. Patty might in some fashion commit a narcotics offense. He instructed at least one of the young women that her job "consisted mainly of working doctors and going to doctors' offices for various reasons, one being to obtain prescriptions for narcotics or dangerous drugs."

In late 1967 Dr. Patty became ill but continued to work and see patients; on January 4, 1968, Wolf visited his office, purportedly as a patient, with a request for "medication." When asked what was wrong with her, Wolf replied "nothing," adding she wanted a prescription for "whites" or "dexies." The doctor did not know what she was talking about and was unable to write a prescription until after he had called a pharmacy. The doctor then issued a prescription for 100 tablets of amphetamine sulfate (a drug similar to Dexedrine). Wolf testified that on this occasion she told Dr. Patty that she wanted "dexies to get high."

Dr. Patty suffered an acute myocardial infarction on January 7, but, contrary to his doctor's orders, continued to see patients. Wolf and a second part-time female investigator, introduced as a friend of Wolf, returned to the office on January 10, requested and secured prescriptions for amphetamine sulfate and Empirin Compound with codeine. On January 13, Dr. Patty was hospitalized, returning to his office on March 4. Promptly, on March 7, the second operative introduced a third part-time investigator. On this occasion and on the 13th, 19th and 26th of March the operatives obtained prescriptions for amphetamine sulfate and Empirin; Dr. Patty received $10 for each visit, his standard charge.

On March 29, two of the operatives introduced investigator Suazo, who requested amphetamines and "perc" (Percodan, a narcotic) for the purpose of "getting some kicks." Dr. Patty refused to prescribe percodin, but did write a prescription for amphetamine sulfate and Empirin. Although Dr. Patty thus gave prescriptions to four different persons, each of them had been introduced to him by Patricia Wolf or by another part-time investigator who, in turn, had been introduced by her. Each of these individuals was, of course, a Board operative or investigator.

On this evidence the superior court rejected the Board's finding that the investigation should be upheld because it had been a "fair hunt between fair hunter and fair game." Applying the "origin of intent" test of entrapment, the court found that Dr. Patty did not have a preconceived intent to issue prescriptions for dangerous drugs,[2] but had been lured and induced into that unprofessional conduct "by the persuasive powers of young women who were employed to ensnare him" at a time when his judgment was "seriously impaired, possibly because he was ill."

The court found as to Wolf's visit of January 4: "The visit to Petitioner's office by Wolf on January 4, 1968, did not furnish an occasion or opportunity for Petitioner to choose to act on a pre-existing criminal intent to issue prescriptions for either dangerous drugs or narcotics in violation of the law; and, on the contrary, the purpose of Wolf's original visit was to induce Petitioner to perform an unlawful act in the absence of any pre-existing intent on the part of Petitioner to violate the law."

The court rendered the following findings as to Dr. Patty's illness and the operatives' subsequent visits: "On January 8, 1968, and prior to the visit of Wolf and Krieger to Petitioner's office on January 10, 1968, Petitioner had become ill, suffering from fatigue, instability and severe chest pain, and Petitioner was hospitalized from January 13 until February 2, 1968, for a condition diagnosed as 'acute myocardial infarction' and 'coronary artheroscleosis.' [¶] Both Krieger and Dalton were aware that Petitioner had been ill, but they appeared at his office on March 7, 1968, three days after Petitioner returned to his practice against the advice of his own physician, and Krieger then expressed her sympathy for Petitioner's having suffered an illness which had incapacitated him."

The court found a preconceived plan of entrapment, stating, "Petitioner was entrapped by Wolf on January 4, 1968, into the unlawful act of violating Section 2399.5 of the Business and Professions Code and Wolf's conduct in so entrapping Petitioner was the commencement of a preconceived plan in which Krieger, Dalton and Suazo also participated."

Holding that the defense of entrapment is available in an administrative proceeding, the court rendered the following conclusions of law: "On grounds of repugnancy to good morals, it is entrapment to lure a person into the commission of a crime he did not himself intend to commit, and

---

[2] The Board's disciplinary sanctions were based on its conclusion that Dr. Patty had violated Business and Professions Code sections 2399.5 (prescribing dangerous drugs without prior examination or medical indication) and 2391.5 (prescribing narcotics to persons not under treatment, as proscribed by Health & Saf. Code, § 11163).

this is especially so where the one who induces the commission of the offense is an officer of the law. [¶] Inasmuch as Petitioner's wrongdoing was not the result of a pre-existing intent on his part to engage in unprofessional conduct, and inasmuch as the origin of the intent was in the mind of Suazo, an investigative officer for the State, Petitioner's defense of entrapment is available to him, not in the view that Petitioner as an accused party may go free but that the government cannot be permitted to contend that he is guilty of a crime where government officials are the instigators of Petitioner's conduct."

1. *Entrapment may be asserted as a defense in administrative proceedings to revoke or suspend a license.*

█ We turn first to the primary legal issue raised by this appeal: whether plaintiff may assert entrapment as a defense to the administrative sanctions directed against him. We observe that the majority of decisions of other states have recognized entrapment as a defense in administrative proceedings in which revocation or suspension of a license to practice a profession, trade, or business is at issue.[3] California decisions to date have not definitely established that entrapment is a defense in administrative

---

[3] The following decisions reflect the majority rule: *Jones* v. *Dental Commission* (1929) 109 Conn. 73, 76-77 [145 A. 570, 571] (revocation of dental technician license); *Peters* v. *Brown* (Fla. 1951) 55 So.2d 334, 336 (injunction against unlawful practice of dentistry); *Florida Board of Pharmacy* v. *Hall* (Fla.App. 1963) 157 So.2d 824, 826-828 (revocation of pharmacists' license); *In re Horwitz* (1935) 360 Ill. 313, 326-328 [196 N.E. 208, 213-214] (disbarment of attorney); *Roberts* v. *Illinois Liquor Control Commission* (1965) 58 Ill.App.2d 171 [206 N.E.2d 799] (revocation of liquor license); *In re Davidson* (1947) 64 Nev. 514, 520 [186 P.2d 354, 357] (disbarment of attorney); *Langdon* v. *Board of Liquor Control* (1954) 98 Ohio App. 535 [58 Ohio Ops. 75, 130 N.E.2d 430, 432] (revocation of liquor license); *Ray* v. *Board of Liquor Control* (Ohio App. 1957) 79 Ohio L.Abs. 10 [154 N.E.2d 89] (suspension of liquor license); *In re Najaka* (Pa. County Ct. 1940) 35 Luz. Leg. Reg. Rep. 17 (revocation of liquor license); *In re Revocation of Liquor License of Bayer* (Pa. County Ct. 1944) 38 Luz. Leg. Reg. Rep. 68 (revocation of liquor license); *In re Feeko's Liquor License* (Pa. County Ct. 1955) 45 Luz. Leg. Reg. Rep. 243, 245-246 (revocation of liquor license); *Game Commission* v. *Wargo* (Pa. County Ct. 1956) 46 Luz. Leg. Reg. Rep. 36 (revocation of hunting license).

The few decisions which have declined to "extend" the entrapment defense to administrative proceedings have generally involved liquor regulation matters, and the courts in these cases have frequently relied, at least in part, on numerous criminal cases which reason that since criminal "intent" is not a necessary element in the bulk of liquor regulations, entrapment is no defense to such crimes. (See *Kearns* v. *Aragon* (1958) 65 N.M. 119 [333 P.2d 607, 610]; cf. *State* v. *Ward* (1951) 361 Mo. 1236, 1247-1248 [239 S.W.2d 313, 320].) Thus, properly viewed, these authorities are not necessarily inconsistent with the conclusion we reach here. (But cf. *Knight* v. *Louisiana State Board of Medical Exam.* (La.App. 1968) 211 So.2d 433, 438 (dictum that court is "inclined" not to permit defense of entrapment in medical license revocation proceeding).)

proceedings,[4] but nothing in these cases suggests any reason for our rejection of the majority position of the courts of our sister states.

The defense of entrapment rests on the simple proposition that the state has no business fostering crime. We shall explain that the logic of this defense renders it as fully applicable in the present administrative proceedings as in ordinary criminal prosecutions, and that recognition of the defense of entrapment protects against the arbitrary creation of criminals for the sake of inflicting punishment upon them. We explain also that the State Board of Medical Examiners does not require the power to entrap in order properly to carry out its investigative duties; the state objective of ferreting out physicians who engage in illegal drug traffic is not furthered by entrapment of a doctor who otherwise would not engage in such traffic.

In *People* v. *Benford* (1959) 53 Cal.2d 1, 8-9 [345 P.2d 928], Justice Schauer, writing for a unanimous court, explained the basis for the defense of entrapment: "In California recognition of the defense is said to rest upon the broadly stated grounds of 'sound public policy' and 'good morals.' [Citations.] The precise nature of this public policy has not been spelled out in any California majority opinion concerning entrapment, but obviously California has recognized the defense for reasons substantially similar to those which caused this court, in *People* v. *Cahan* (1955) 44 Cal.2d 434, 445-446 [7] [282 P.2d 905, 50 A.L.R.2d 513], to adopt the rule that evidence obtained in violation of constitutional guaranties is not admissible; i.e., out of regard for its own dignity, and in the exercise of its power and the performance of its duty to formulate and apply proper standards for judicial enforcement of the criminal law, the court refuses to enable officers of the law to consummate illegal or unjust schemes designed to foster rather than prevent and detect crime."

Other courts explain the defense of entrapment in similar terms. Justice Frankfurter, in *Sherman* v. *United States* (1958) 356 U.S. 369, 380 [2 L.Ed.2d 848, 855-856, 78 S.Ct. 819] (concurring opinion) asserted that recognition of this defense is essential to sustain "[p]ublic confidence in the fair and honorable administration of justice, upon which ultimately depends the rule of law." A federal district court described entrapment as "an affront to the basic concepts of justice" (*United States* v. *Chisum*

---

[4]Compare *Whitlow* v. *Board of Medical Examiners* (1967) 248 Cal.App.2d 478, 489-490 [56 Cal.Rptr. 525] (assuming in dictum that entrapment is an available defense) with *Shakin* v. *Board of Medical Examiners* (1967) 254 Cal.App.2d 102, 109 [62 Cal.Rptr. 274, 23 A.L.R.3d 1398] (stating that availability of the defense remains in doubt). See also *Harris* v. *Alcoholic Bev. etc. Appeals Bd.* (1966) 245 Cal.App.2d 919, 924 [54 Cal.Rptr. 346]; *United Liquors* v. *Dept. Alc. Bev. Cont.* (1963) 218 Cal.App.2d 450, 454 [32 Cal.Rptr. 603].

(C.D.Cal. 1970) 312 F.Supp. 1307, 1312); the Florida Supreme Court stated that "[i]t is contrary to law and public policy for an officer or member of an administrative board to induce the commission of a wrong or a crime for the purpose of securing a pretext to punish it." (*Peters* v. *Brown* (Fla. 1951) 55 So.2d 334, 336.)[5]

In essence, the courts have concluded that recognition of the defense of entrapment is crucial to the fair administration of justice. If this is true for proceedings before trial courts, it is no less true for proceedings before administrative agencies. "Sound public policy" and "good morals" (*People* v. *Benford* (1959) *supra,* 53 Cal.2d 1, 9) are incompatible with entrapment of an innocent person into the commission of a crime in order to revoke his professional license as clearly as they are incompatible with entrapment in order to obtain a criminal conviction. It is as important for the agency, as for a court of law, to observe a "regard for its own dignity." (*Id.*) The public's concern with the fair administration of justice attaches equally to administrative as to judicial proceedings. The agency, no less than the court, must "formulate and apply proper standards" (*id.*) for enforcement of the law; neither should permit its officers "to consummate illegal or unjust schemes designed to foster rather than prevent and detect crime." (*Id.*)[6] The function of the enforcement officials is to investigate, not instigate, crime; to discover, not to promote, crime.

In our recent decision in *Redner* v. *Workmen's Comp. Appeals Bd.* (1971) 5 Cal.3d 83 [95 Cal.Rptr. 447, 485 P.2d 799], we confirmed that an administrative agency must reject evidence inconsistent with the dignity of its proceedings and the fair administration of justice. In *Redner,* the

---

[5] The public policy condemning entrapment by government agents was enunciated early by the courts. (See, e.g., *In re Moore* (1924) 70 Cal.App. 483, 487-488 [233 P. 805]; *Woo Wai* v. *United States* (9th Cir. 1915) 223 F. 412, 415.) And the notion that the object of the entrapment defense is to prevent the wrong of allowing state officials to turn innocent men into criminals is almost universally accepted in this country. (See generally Note, *The Serpent Beguiled Me and I Did Eat: The Constitutional Status of the Entrapment Defense* (1965) 74 Yale L.J. 942, 943.)

[6] It is of no consequence that the improper behavior in this case arises in a "civil" proceeding rather than in a "criminal" context. Although in recent years the entrapment concept has been applied primarily in criminal cases, as Justice Roberts, joined by Justices Brandeis and Stone, explained in the seminal entrapment case of *Sorrells* v. *United States* (1932) 287 U.S. 435, 455 [77 L.Ed. 413, 424, 53 S.Ct. 210, 86 A.L.R. 249] (concurring opinion), the roots of the entrapment doctrine lie in civil cases: "Always the courts refuse their aid in civil cases to the perpetration and consummation of an illegal scheme. Invariably they hold a civil action must be abated if its basis is violation of the decencies of life, disregard of the rules, statutory or common law, which formulate the ethics of men's relations to each other. Neither courts of equity nor those administering legal remedies tolerate the use of their process to consummate a wrong. *The doctrine of entrapment in criminal law is the analogue of the same rule applied in civil proceedings."* (Italics added; fn. omitted.)

Workmen's Compensation Appeals Board, in reducing an applicant's permanent disability rating from that found by the referee, relied on a movie obtained by the fraudulent inducements of private investigators. We annulled the board's order, stating that "Evidence obtained by fraud and deceit in violation of the rights of the applicant . . . is not 'best calculated to ascertain the substantial rights of the parties and carry out *justly* the spirit and provisions' of the workmen's compensation laws. The high purposes of the compensation law should not be perverted by resort to evidence perfidiously procured. We therefore conclude that the board may not rely upon evidence obtained, as in the present case, by deceitful inducement of an applicant to engage in activities which he would not otherwise have undertaken." (5 Cal.3d at p. 95.) (Original italics.)

The holding of *Redner* applies with doubled force to the present case. In *Redner* the deceit was the tool of private investigators; here the deception was employed by agents of the administrative body. Moreover, unlike *Redner,* the agents in the present case aimed to induce *criminal* activity.

Although the defense of entrapment may find application in other administrative proceedings, it is particularly important when, as here, a single agency combines both investigative and adjudicative powers. If such an agency rejects entrapment as a defense, it in effect authorizes its investigators to entrap, and encourages a shift of resources from the detection of illegal acts to the promotion of such acts. Public confidence in the administration of justice by such an agency cannot be sustained when that same agency in performing its investigative role employs methods contrary to " 'sound public policy' and 'good morals.' " (*People* v. *Benford* (1959) *supra,* 53 Cal.2d 1, 9.)[7]

Further, to endow an administrative agency which already combines investigatory and adjudicatory powers with the power of entrapment is to invite the appearance and danger of abuse and discrimination. When an administrative body invokes its authority to initiate inquiry, the range of investigation is left largely within the discretion of the agency. (See *Federal Comm'n* v. *Broadcasting Co.* (1940) 309 U.S. 134, 142-144 [84 L.Ed. 656, 661-663, 60 S.Ct. 437].) The enormous power thus posited in such

---

[7]Exercise of the investigatory power " 'is in many cases the first, and in many the only, point of personal contact between an administrative agency and the person with whom the agency is dealing. . . . Dissatisfaction with the way in which [investigative] personnel perform [their] duties could thus go far to impair public confidence in the whole administrative process.' " (Schwartz, An Introduction to American Administrative Law (2d ed. 1962) pp. 167-168, quoting Benjamin, Administrative Adjudication in New York (1942) p. 73.)

an agency, as well as the dangers for its abuse, has often been stressed by legal writers.[8] Abuse is realized when the power of government is "employed to promote rather than detect crime and to bring about the downfall of those who, left to themselves, might well have obeyed the law." (*Sherman v. United States* (1958) *supra,* 356 U.S. 369, 384 [2 L.Ed.2d 848, 857-858] (Frankfurter, J., concurring).) And the availability of entrapment tactics opens the possibility that an agency will discriminatorily *select* a practitioner, seek out his human weaknesses, and by persuasion and inducement condemn him for professional execution.[9] Such an abuse of governmental power provides the unconventional practitioner with little protection from the " 'likely prejudices of a professional licensing body.' " (*Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 145 [93 Cal.Rptr. 234, 481 P.2d 242], quoting Jaffe, Judicial Control of Administrative Action (1965) pp. 191-192.)

Moreover, the use of entrapment techniques cannot be justified as necessary to a regulatory agency's fulfillment of its investigatory function. The protection of society from criminal elements within a trade or profession is not served by enticing into criminal activity those who have thus far avoided and abstained from wrongdoing. By barring the use of entrapment in administrative proceedings we do not limit legitimate investigation efforts; we only curtail activity which seeks to induce the perpetration of a crime for the sake of punishment. As we explain below, the two arguments pressed by the Board fail to come to grips with this fundamental distinction.

The Board first contends that an administrative agency must be allowed to monitor or "spot check" the activities of its licensees if it is to fulfill its duties, necessitating at times the use of undercover decoys. This court has,

---

[8]See e.g., Davis, Discretionary Justice (1969) page 25 ("Yet every truth extolling [administrative] discretion may be matched by a truth about its dangers: Discretion is a tool only when properly used; like an axe, it can be a weapon for mayhem or murder."); Chamberlain, Dowling & Hays, The Judicial Function in Federal Administrative Agencies (1942) pages 81-82 ("The inspection and investigation functions of administrative agencies are *per se* enormously powerful weapons. . . ."); Root, *Address of the President* (1916) 41 A.B.A. Rep. 355, 369 ("Yet the powers that are committed to these regulating agencies . . . carry with them great and dangerous opportunities of oppression and wrong.").

[9]The use of entrapment has been condemned as providing police with the power "to turn almost anyone into a defendant by selecting a means designed to exploit his particular weakness." (Note, *The Serpent Beguiled Me and I Did Eat: The Constitutional Status of the Entrapment Defense* (1965) 74 Yale L.J. 942, 947; cf. *Sherman v. United States* (1958) *supra,* 356 U.S. 369, 376 [2 L.Ed.2d 848, 853].) In this context we note that this court has held invalid a licensing statute which conferred upon presently licensed opticians an unlimited and unguided discretion to exclude from their profession any and all persons. (*Blumenthal* v. *Board of Medical Examiners* (1962) 57 Cal.2d 228 [18 Cal.Rptr. 501, 368 P.2d 101].) Unlimited discretion to isolate a victim for entrapment and thus bar that individual from a profession is not far removed from the power condemned in *Blumenthal.*

indeed, consistently recognized that ". . . where a defendant has a pre-existing criminal intent, the fact that when solicited by a decoy he commits a crime does not show entrapment. . . ." (*People* v. *Benford* (1959) *supra,* 53 Cal.2d 1, 10; see e.g., *People* v. *Malotte* (1956) 46 Cal.2d 59, 64-65 [292 P.2d 517]; *People* v. *Braddock* (1953) 41 Cal.2d 794, 802 [264 P.2d 521].) If the criminal intent originates in the mind of the government agent and the wrongful conduct is realized through allurements, inducements and persuasions, however, the undercover agent has gone far beyond a "spot check" or "monitoring"; he has exploited the human weaknesses in an otherwise innocent licensee so that the state may then punish. Properly viewed, the entrapment defense isolates and seeks to deter only this abuse of governmental power. The courts do not countenance such an abuse; it is no less objectionable when utilized by an administrative tribunal.

Secondly, in the instant case we deal with the peculiar problem of drug trafficking in conjunction with physicians' ready access to drugs, and the Board argues that at least in this limited field it should be free to revoke or suspend the license of a doctor who, even though entrapped, wrongfully dispenses narcotics. This argument again assumes, however, that society is benefitted by allowing the Board to entrap and thus exclude from the profession those doctors who succumb to the Board's persuasions. This premise mistakenly equates seduction of the innocent with apprehension of the guilty. "The law seeks justice, not victims." (*In re Revocation of Liquor License of Bayer* (Pa. County Ct. 1944) 38 Luz. Leg. Reg. Rep. 68, 69.)

Thus, for the reasons discussed above, we conclude that the trial court properly determined that the defense of entrapment is available in administrative proceedings at which revocation or suspension of a license to practice a profession or business is at issue.

2. *The trial court's finding that plaintiff was entrapped is supported by substantial evidence in the record.*

 Having determined that the defense of entrapment is applicable to the Board's administrative proceedings, we turn to the question whether substantial evidence supports the trial court's finding that Dr. Patty was in fact entrapped in the instant case.[10]

---

[10]In a mandamus proceeding to review an administrative decision of the Board of Medical Examiners which will substantially interfere with a vested, fundamental right, the trial court must exercise its independent judgment on the facts. (See *Bixby* v. *Pierno, supra* (1971) 4 Cal.3d 130, 143-147.) An administrative revocation or suspension of a professional license to practice medicine necessarily requires such an independent review. (*Yakov* v. *Board of Medical Examiners* (1968) 68 Cal.2d 67, 69,

In California, the defense of entrapment is commonly formulated as dependent upon ". . . whether the intent to commit the crime originated in the mind of defendant or in the mind of the entrapping officer. . . ." (*People* v. *Benford* (1959) *supra*, 53 Cal.2d 1, 10.) ▪ Accordingly, the decisions establish that entrapment occurs if the criminal intent is conceived in the mind of the state agent and the accused is lured into commission of the crime by persuasion or deceitful representation. (See, e.g., *People* v. *Moran* (1970) 1 Cal.3d 755, 761, fn. 4 [83 Cal.Rptr. 411, 463 P.2d 763] (reproducing with approval revised CALJIC No. 851).) On the other hand, entrapment does not occur if the accused harbors a preexisting criminal intent and commits the crime because of solicitation by a decoy. (See, e.g., *People* v. *Nunn* (1956) 46 Cal.2d 460, 471 [296 P.2d 813]; *People* v. *Malotte* (1956) *supra*, 46 Cal.2d 59, 64-65; *People* v. *Braddock* (1953) *supra*, 41 Cal.2d 794, 802; *People* v. *Moran* (1970) *supra*, 1 Cal.3d 755, 761, fn. 4 (reproducing with approval revised CALJIC No. 852).)[11]

▪ After completely reviewing all the evidence in the instant case, the trial court found it "inescapable that [Dr. Patty's] wrongdoing was not the result of a pre-existing intent on his part to engage in unprofessional conduct"; instead, the court concluded that the doctor had been lured, flattered and persuaded by young women seeking to "ensnare" him. The Board argues, however, that this finding of entrapment cannot be sustained on a record which shows that plaintiff "readily complied" with the operatives' requests on several occasions. ▪ Although the "readiness" of an individual to commit a crime is certainly one factor to be considered in determining whether he harbored a pre-existing intent to commit the crime (see, e.g., *People* v. *Benford* (1959) *supra*, 53 Cal.2d 1, 12), it normally lies with the trier of fact to determine what inference, if any, should be drawn from an individual's seemingly "ready compliance" with solicitation to illegal conduct. (See *People* v. *Ballard* (1959) 167 Cal. App.2d 803, 821-822 [335 P.2d 204]; *People* v. *Reed* (1954) 128 Cal.

72, fn. 3 [64 Cal.Rptr. 785, 435 P.2d 553] (revocation); *Moran* v. *Board of Medical Examiners* (1948) 32 Cal.2d 301, 308 [196 P.2d 20] (suspension).) On appeal, however, we are bound to sustain the trial court's finding of fact so long as such findings are supported by substantial evidence. (*Moran* v. *Board of Medical Examiners*, *supra*, 32 Cal.2d 301, 308; see *Yakov* v. *Board of Medical Examiners*, *supra*, 68 Cal.2d 67, 71-73; *Merrill* v. *Department of Motor Vehicles* (1969) 71 Cal.2d 907, 915 [80 Cal. Rptr. 89, 458 P.2d 33].)

[11]See generally Note, *The Defense of Entrapment in California* (1968) 19 Hastings L.J. 825, 842-846. The United States Supreme Court has established a similar standard. (See, e.g., *Lopez* v. *United States* (1963) 373 U.S. 427, 434-435 [10 L.Ed.2d 462, 467-468, 83 S.Ct. 1381]; *Sorrells* v. *United States* (1932) *supra*, 287 U.S. 435, 454 [77 L.Ed. 413, 423].)

App.2d 499, 502 [275 P.2d 633]; cf. *People* v. *Hawkins* (1962) 210 Cal. App.2d 669, 672 [27 Cal.Rptr. 144]; *People* v. *Gutierrez* (1954) 128 Cal. App.2d 387, 390 [275 P.2d 65].) As the Court of Appeal observed in *People* v. *Goree* (1966) 240 Cal.App.2d 304, 310-311 [49 Cal.Rptr. 392], even "hair trigger susceptibility" to an agent's suggestion, "standing alone, does not negative entrapment as a matter of law."

In the instant case, although the record reveals that plaintiff improperly issued prescriptions to the Board's operatives on a number of occasions, it also shows that prior to the solicitation by the Board's investigators plaintiff's professional record was unblemished; indeed, the Board's own initial investigation found Dr. Patty innocent of any wrongdoing. From this background,[12] and from Dr. Patty's lack of familiarity with the vernacular—"whites" or "dexies"—used by the Board's agent,[13] the trial court could properly infer that plaintiff entertained no preexisting intent to engage in the sale of restricted drugs; the doctor apparently did not even know the common names of the drugs.

Moreover, the trial court could also infer from the description of the investigators' operations that the illegal intent was generated in the mind of the Board's agents rather than in the mind of the doctor. Agent Suazo directed the operatives to "work doctors" to "obtain" illegal prescriptions. The operatives were not told simply to investigate whether the doctor would seize an opportunity to prescribe drugs illegally. Instead they were instructed to "work doctors" to *get* illegal prescriptions, almost a directive to entrap. We note in this connection that the employment of young women to obtain illegally prescribed drugs from elderly male doctors is not a new tactic to agents of the Board. (See, e.g., *Yakov* v. *Board of Medical Examiners* (1968) *supra,* 68 Cal.2d 67, 69; *Whitlow* v. *Board of Medical Examiners* (1967) 248 Cal.App.2d 478, 489-490 [56 Cal.Rptr. 525].)

---

[12]In *Sorrells* v. *United States* (1932) *supra,* 287 U.S. 435, the United States Supreme Court found that the defense of entrapment was available where an undercover prohibition agent, posing as a tourist, induced defendant—who had no prior record of violation—to obtain a bottle of illegal liquor. (See also *Peters* v. *State* (1970) 248 Ark. 134 [450 S.W.2d 276, 278] (no evidence of prior dealing); *Gray* v. *State* (1967) 249 Ind. 629 [231 N.E.2d 793, 796] (same); *Morei* v. *United States* (6th Cir. 1942) 127 F.2d 827 (no prior connection of physician-defendant with drug traffic); and cases cited in Note, 33 A.L.R.2d 883, 900-902.)

[13]These facts contrast sharply with cases inferring a preexisting criminal intent from a defendant's familiarity with criminal activity. (See, e.g., *People* v. *Moreno* (1965) 237 Cal.App.2d 602, 606 [47 Cal.Rptr. 287]; *People* v. *Estrada* (1963) 211 Cal.App.2d 722, 726-727 [27 Cal.Rptr. 605]; *People* v. *Neal* (1953) 120 Cal.App.2d 329, 333 [261 P.2d 13].)

Under these circumstances, we certainly cannot hold as a matter of law that the evidence is insufficient to support the trial court's finding of entrapment.

### 3. *Conclusion.*

In recognizing the applicability of an entrapment defense in a disbarment proceeding, the Supreme Court of Illinois observed: "For the lawyer in active practice real temptations are plentiful and sufficient without their artificial multiplication by . . . parties whose real motives can with certainty be known only to themselves. The lawyer must deal with exaggerations, fraud and actual perjury day after day, and occasionally these things come from his own clients without his knowledge or consent. His path is hazardous at best, and if he can so far avoid its natural pitfalls as to maintain and be able to prove a good reputation, it should be sufficient to protect him against plots and schemes." (*In re Horwitz* (1935) 360 Ill. 313, 328 [196 N.E. 208, 214].)

These observations apply equally to the present case. Society gains little by the government's inducement of a physician, who has avoided the pitfalls of illicit conduct for 20 years, into performing a criminal act. To exclude such a doctor from his profession is to remove from the community one who, but for the wrongful governmental conduct, "might well have obeyed the law" (*Sherman* v. *United States* (1958) *supra,* 356 U.S. 369, 384 (Frankfurter, J., concurring)) throughout the remainder of his practice. Outweighing this questionable "gain" is the loss of an otherwise law-abiding and useful physician.

The judgment is affirmed.

Wright, C. J., McComb, J., Mosk, J., Burke, J., Sullivan, J., and Files, J.,\* concurred.

---

\*Assigned by the Chairman of the Judicial Council.