[No. D039443. Fourth Dist., Div. One. Aug. 2, 2002.]

DEPARTMENT OF ALCOHOLIC BEVERAGE CONTROL, Petitioner, v.
ALCOHOLIC BEVERAGE CONTROL APPEALS BOARD, Respondent;
4805 CONVOY, INC., Real Party in Interest.

## COUNSEL

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, David M. Tiede, Deputy Attorney General, for Petitioner.

No appearance for Respondent.

Law Offices of William R. Winship, Jr., for Real Party in Interest.

## OPINION

**McINTYRE, J.**—An exotic dancer violated a Department of Alcoholic Beverage Control regulation relating to the display of genitals, breasts and buttocks after an undercover officer asked her if her next dance would involve "more skin." The question presented is whether the officer's conduct amounted to entrapment as a matter of law. We conclude that it did not.

### INTRODUCTION

The Department of Alcoholic Beverage Control (the Department) has broad discretion to revoke or suspend a liquor license if it determines "for good cause" that continuing the license would be "contrary to public welfare or morals . . . ." (Cal. Const., art. XX, § 22; Bus. & Prof. Code, § 24200.) Pursuant to its regulations, the Department may take disciplinary action against a licensee that allows its performers to expose their external genitalia or pubic hair, or to expose their breasts or buttocks, unless certain conditions are met, to its patrons. (Cal. Code Regs., tit. 4, § 143.3 (section 143.3).) Entrapment is a defense to a Department licensure proceeding. (See *Provigo Corp. v. Alcoholic Beverage Control Appeals Bd.* (1994) 7 Cal.4th 561, 569 [28 Cal.Rptr.2d 638, 869 P.2d 1163]; *Patty v. Board of Medical Examiners* (1973) 9 Cal.3d 356, 362-363 [107 Cal.Rptr. 473, 508 P.2d 1121, 61 A.L.R.3d 342].)

### FACTUAL AND PROCEDURAL BACKGROUND

4805 Convoy, Inc., doing business as Dream Girls (Dream Girls), is licensed by the Department to operate a business that serves food and beverages and provides adult entertainment. About midnight on March 2, 2000, San Diego Police Department Detective Kenneth Nelson did an undercover inspection of Dream Girls' premises. He sat at a table, ordered a beer and watched dancer Mary Diann Gast perform two dances on stage. After Gast finished on stage, Detective Nelson approached her as she sat at the bar and requested that she perform a couch dance for him. Gast escorted Detective Nelson to a couch and danced for him, without violating section 143.3, for several minutes.

After finishing the first couch dance, Gast inquired if Detective Nelson wanted another dance. He responded by asking if there would be "more skin involved," but did not offer to pay Gast any additional money for complying with his request. Gast performed a second couch dance, during which she exposed her breasts and buttocks to Detective Nelson, rubbed her breasts against his body, from his crotch area up to his face, and showed him her

anus, perineum and vaginal area. Detective Nelson paid Gast $10 for each couch dance, and in accordance with customary patron practice, may have paid her a $5 tip for the couch dances, before returning to his table. Detective Nelson stayed on site for another 15 to 30 minutes, but did not observe any more violations.

The Department filed an accusation charging Dream Girls with three violations of section 143.3 arising out of Gast's second couch dance for Detective Nelson. At the administrative hearing, the Department introduced evidence regarding the circumstances described above. Dream Girls introduced evidence that it was aware of the applicable regulations, monitored its performers to ensure compliance and terminated two to three performers a week for violating the rules. On a couple of prior occasions, Dream Girls had sent Gast home and counseled her when she had "pushed" the rules, but it had not had any trouble with her in the six months or so preceding this incident. As of the time of the hearing, Gast was no longer working at Dream Girls. She was not called to testify at the hearing.

After the close of evidence, Dream Girls argued that the Department failed to timely notify it of the violations and, as a result, it was unable to preserve the videotape taken that night by its surveillance cameras or to identify witnesses who might have refuted the Department's evidence. It pointed out that the violations occurred for a very brief period of time and only after Detective Nelson's request for "more skin."

In its proposed decision, the administrative law judge (the ALJ) found that Dream Girls violated section 143.3 as alleged in two of the three charges and suspended Dream Girls' liquor license for 30 days. Acknowledging that Gast engaged in the violations only after the detective asked whether there would be "more skin," the ALJ concluded that the detective's conduct did not rise to the level of entrapment, but indicated that it considered this circumstance in determining the appropriate penalty. The Department adopted the ALJ's decision as its own. Dream Girls appealed to the Alcoholic Beverage Control Appeals Board (the Board), which reversed the Department's decision based on its conclusion that Detective Nelson's conduct constituted entrapment. The Department now appeals.

## DISCUSSION

### 1. *Standard of Review*

The Board's review of a Department decision is closely circumscribed by law and is generally limited to consideration of whether (1) the

Department proceeded without or in excess of its jurisdiction; (2) it proceeded in the manner required by law; (3) its decision is supported by its findings; and (4) its findings are supported by substantial evidence in light of the whole record. (Cal. Const., art. XX, § 22; Bus. & Prof. Code, § 23084.) In reviewing the Department's factual findings, the Board must resolve all conflicts in the evidence in the Department's favor and it is bound by those findings that are supported by substantial evidence even if it believes a contrary finding is more reasonable. (*Boreta Enterprises, Inc. v. Department of Alcoholic Beverage Control* (1970) 2 Cal.3d 85, 94-95 [84 Cal.Rptr. 113, 465 P.2d 1].) On appeal, we apply the same standard of review as the Board. (*Id.* at pp. 94-96; *Harris v. Alcoholic Bev. Con. Appeals Bd.* (1963) 212 Cal.App.2d 106, 113 [28 Cal.Rptr. 74].)

## 2. *Entrapment*

Ordinarily, whether particular conduct by a law enforcement officer amounts to entrapment is a question of fact (*People v. Barraza* (1979) 23 Cal.3d 675, 691, fn. 6 [153 Cal.Rptr. 459, 591 P.2d 947] (*Barraza*)) and the trier of fact's finding on the issue of entrapment will be upheld on appeal if there is any substantial evidence in the record, contradicted or not, to support that finding. (*People v. Lee* (1990) 219 Cal.App.3d 829, 836 [268 Cal.Rptr. 595].) The relevant facts of this case are not in dispute and thus the issue presented is whether Detective Nelson's question about whether there would be "more skin" amounted to entrapment as a matter of law.

The test for determining entrapment is whether the acts of the law enforcement agent are "likely to induce a normally law-abiding person to commit the offense." (*Barraza, supra,* 23 Cal.3d at pp. 689-690.) Although this test focuses primarily on the conduct of the law enforcement agent, it also requires consideration of the effect that the conduct would have on a normally law-abiding person under the circumstances presented. (*Id.* at p. 690.) Thus, for example, "the transactions preceding the offense, the suspect's response to the inducements of the officer, the gravity of the crime, and the difficulty of detecting instances of its commission" are relevant to a determination of whether the officer's conduct constituted entrapment. (*Ibid.*) However, the test is objective rather than subjective and thus the suspect's character, predisposition to commit the offense and subjective intent in committing the crime are irrelevant. (*Id.* at pp. 690-691.)

Although the determination of the entrapment issue must be made on a case-by-case basis, two guiding principles apply. "First, if the actions of the law enforcement agent would generate in a normally law-abiding person

a motive for the crime other than ordinary criminal intent, entrapment will be established." (*Barraza, supra,* 23 Cal.3d at p. 690.) Second, "affirmative police conduct that would make commission of the crime unusually attractive to a normally law-abiding person," such as a guarantee that the act is not illegal or will go undetected, an offer of exorbitant consideration, or any similar enticement, will also constitute entrapment. (*Ibid.*; see also *People v. Watson* (2000) 22 Cal.4th 220, 222 [91 Cal.Rptr.2d 822, 990 P.2d 1031].) Pursuant to these principles, "overbearing conduct such as badgering, cajoling, importuning, or other affirmative acts likely to induce a normally law-abiding person to commit the crime" suffices as entrapment, but official conduct that merely provides an opportunity to commit a crime does not. (*Barraza, supra,* 23 Cal.3d at p. 690.)

■ Dream Girls argues that Detective Nelson's conduct amounted to entrapment because Gast did not have a preexisting intent to violate the regulation, but engaged in the illegal dance only at his behest. Applying a somewhat similar analysis, the Board concluded that although the officer's request to see "more skin" was not "overbearing" under the standards enunciated in *Barraza,* the conduct constituted entrapment because it was an affirmative act the officer knew was likely to induce Gast to commit a violation.

To the extent that Dream Girls and the Board rely on the notion that Gast did not harbor a preexisting criminal intent but instead merely responded to Detective Nelson's request, this reliance is misplaced, for several reasons. First, such an analysis is based on a subjective standard that focuses on the suspect's state of mind (known as the "origin-of-intent" test), rather than an objective standard that focuses primarily on the conduct of the officer, to determine the issue of entrapment. The California Supreme Court has expressly rejected this analysis. (*Barraza, supra,* 23 Cal.3d at pp. 686-690.) Second, even if the officer was aware that Gast had a financial motivation to commit the violation, this does not render his request overbearing or make the request anything more than the mere opportunity for Gast to act on her financial motivation by committing the regulatory violation.

For purposes of determining the issue of entrapment, Detective Nelson's conduct in this case is virtually indistinguishable from the conduct of officers involved in a typical undercover drug operation, in which an officer approaches a possible drug source on the street and offers to buy drugs. Such a request has been uniformly held to be a permissible police stratagem absent additional overbearing conduct or pressure by the officer. (*Provigo Corp. v. Alcoholic Beverage Control Appeals Bd., supra,* 7 Cal.4th at p. 569.)

Detective Nelson's conduct in this case was not of such a nature that it was "likely to induce a normally law-abiding person to commit the offense." (*Barraza, supra,* 23 Cal.3d at pp. 689-690.) In fact, Dream Girls' own evidence established that its performers were well aware of what conduct was prohibited and that 60 to 70 percent of them "never pushed the rules" despite having the same motivation as Gast to do so. The Board erred in concluding that Detective Nelson's conduct amounted to entrapment. Accordingly, we grant the petition for writ of review and annul the Board's order reversing the decision of the Department. We remand the matter for further proceedings.

Haller, Acting P. J., and McDonald, J., concurred.