(No. 26108.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* RUBIN JERSKY, Plaintiff in Error.

*Opinion filed June 17, 1941—Rehearing denied September 15, 1941.*

GRENVILLE BEARDSLEY, (DONALD E. BLODGETT, of counsel,) for plaintiff in error.

GEORGE F. BARRETT, Attorney General, and THOMAS J. COURTNEY, State's Attorney, (EDWARD E. WILSON, JOHN T. GALLAGHER, and MELVIN S. REMBE, of counsel,) for the People.

Mr. JUSTICE SHAW delivered the opinion of the court:

Rubin Jersky was convicted of murder in the criminal court of Cook county on a trial before a jury. This writ of error seeks review of a judgment entered on the verdict of that jury whereby he was sentenced to a term of twenty years imprisonment.

The man who was killed by Jersky was Donald Warden who lived with his wife and baby in the first or ground floor apartment at 1143 South Central Park avenue in the city of Chicago. The defendant, Jersky, lived on the other side of South Central Park avenue, nearly, but not quite, across the street from the Wardens. Across the alley to the south from the Warden's apartment was an oil station, while in front of their apartment, between the sidewalk and the curb, was a strip of parkway or lawn.

On the evening of November 3, 1938, when the killing occurred, the Warden family was at home and Warden, having relaxed for the evening, was coatless and in house slippers. At about 8:00 o'clock one Wallace Perper drove his car up over the curb and parked it on the lawn in front of Wardens' living room windows. While the evidence is somewhat confusing it is clearly to be inferred from all of it that this act made Warden angry and that, dressed as he then was, he went outdoors for the purpose of doing something about this irregular parking. This man Perper who parked his car on Warden's lawn appears to have been a friend of Irving Jersky, a brother of the defendant. It also appears from the record that the deceased was giving Perper and Irving Jersky the worst of an unarmed combat and had chased them around the oil station when the Jersky-Perper combination was reinforced by the arrival of brother Rubin, the defendant, from his home across the street, and Rubin himself came implemented with a .38 caliber revolver.

With the arrival of these reinforcements Warden retreated up the twelve or fourteen steps leading into his home, and was killed on his own porch. There were two doors to the apartment, one opening into the vestibule, and the other from the vestibule into his living room. The outer vestibule door was open while the inner was closed and locked. After the shooting, Warden fell and lay face down with his feet toward the street and his head on the outer threshold.

There was ample evidence from which the main facts can be clearly understood, the points of difference being slight and to be later noticed. Thus it is quite clear that the deceased started the fight and that he carried it on until the arrival of the defendant with his pistol. It is also clear that Warden had desisted from the conflict and retreated to his own locked front door before he was killed. There is also evidence making it reasonably certain that the defendant called the deceased a coward and various vile names while challenging him to come down off his porch and fight. It is proved by all of the witnesses, including the defendant himself, that the fatal shot was fired while the deceased was at the top of the porch stairway and the defendant was on the stairs. The only conflict in the evidence comes at this point.

The witnesses for the People gave evidence tending to prove that the defendant Jersky followed Warden up onto his porch, challenged him to put up his fists and fight, and that when Warden offered to put up his fists and fight Jersky shot him. Jersky's version of it is that he saw Warden beating his younger brother and ran over to try and break it up. He testified that he saw this on the sidewalk in front of the house and stepped between them yelling "Break up the fight!"; that Warden hit him twice and that he fell down temporarily unconscious; that the next thing he knew the fight was still going on and that he ran up the stairway telling them to "break it up;" that he had the gun in his hand as he ran up the stairs during all of which time Warden was hitting his brother; that when he got up to the top of the stairway Warden turned from his brother and started hitting him; that he kept backing down the stairs holding the revolver in his left hand; that Warden grabbed his left hand and tried to twist the gun away from him, whereupon the revolver accidentally exploded with results above mentioned.

Dr. Jerry J. Kearns, coroner's physician of Cook county, examined the body of Warden and conducted an autopsy. In his testimony as to qualification it appears that he has performed eight thousand *post-mortem* examinations, between a thousand and fifteen hundred of them on the bodies of persons who had died from bullet wounds. It was the opinion of this witness that the bullet which caused the death had been fired from a distance of two feet or more, and, in any event, not less than eighteen inches from the point of entrance. His opinion as to this was based upon observations and experiments conducted over a period of ten years.

Immediately after the shooting, the defendant became a fugitive for eighteen days and could not be and was not found by the police until his attorney brought him to the State's attorney's office and surrendered him to custody. The record shows that an intensive police search for him during this period of eighteen days was entirely fruitless. He admitted, on cross-examination, that he spent these eighteen days at the home of his mother, although he knew the police were looking for him. It was proved by the police that they had looked for him at the home of his mother but he was not there.

It is apparent from the record that during this eighteen days something happened to some of the People's witnesses. Several of them were very forgetful, apparently reluctant to testify, and one of them who was an eye-witness to the shooting had to be called as a court's witness because of the conflicting statements he had made to the police at different times. A considerable amount of conflicting reputation evidence was also introduced. A number of witnesses testified that the defendant's reputation for truth and veracity was bad and that they would not believe him under oath, while others testified that it was good. Likewise, a number testified that his reputation as a peaceable and law-

abiding citizen was good, and others testified that it was
bad. Witnesses were called who testified that the deceased
had the reputation of being a quarrelsome fellow, but, on
the other hand, an equal number testified that he had exactly
the opposite reputation.

The evidence on these various matters of reputation is
not conclusive on any point, but we do not think it of any
great importance to the decision of the case in this court,
after the facts have been found by a jury. For the pur-
poses of this review we might assume everything to be as
the defendant claims it is without materially affecting the
disposal of the case. The fact is that the defendant comes
so extremely close to convicting himself on his own testi-
mony as to require but little probative force from the tes-
timony of other witnesses and from the surrounding cir-
cumstances to sustain the verdict of the jury.

Plaintiff in error questions the correctness of the ruling
of the court on the admission of evidence and instructions
to the jury. His first objection as to the evidence con-
cerns the testimony of Dr. Kearns as to the distance from
which the bullet was fired. This objection is based upon
our holding in *People* v. *Rongetti,* 338 Ill. 56, and other
similar cases, wherein it has been held that an expert wit-
ness may not give his opinion as to an ultimate fact where
to do so would invade the province of the jury. These
cases are not in point, and this argument is without force,
because the distance from which the revolver was fired
was only an evidentiary, not an ultimate fact. Another
objection to evidence questioned the admissibility of a
photograph of the body of the deceased as it lay on the
porch immediately after the killing. It was proved that
the position of the body had not been changed and that
the picture introduced in evidence was a true and perfect
photographic representation of what the policemen and
police photographer saw when they arrived at the place
of the homicide. It is urged that this was prejudicial and

inflammatory, adding nothing to the other evidence in the case. We have examined the photograph which shows the position of the body in relation to the porch and vestibule, and think it helpful in an understanding of the case. We see nothing prejudicial in its admission and it was not error that it was admitted. Other objections to the court's rulings as to evidence are extremely trivial.

Defendant's principal contentions refer to the giving and refusing of instructions. One instruction was given which was criticized by this court in *People* v. *Biella*, 374 Ill. 87. In that case the court criticized the words "and if the jury are convinced beyond all reasonable doubt from all the evidence of the guilt of the defendant, the fact that the defendant has previously borne such a good reputation is not sufficient to justify an acquittal." It was held in that case that that instruction should not have been given without some modifying or clarifying language. This court did not, however, reverse the judgment in the *Biella case* for that reason alone, and a reading of the case makes it doubtful that it would have done so had that been the only error in the record. It would require but the addition of a few words and the right punctuation to make the instruction entirely proper, and even as given in that case it could easily be considered as harmless error if taken in connection with a full series of instructions correctly stating the law.

The defendant's difficulties and complaints in regard to instructions are of his own creation. The defense which he offered was multifarious and confusing and was probably so intended. He had a right, of course, to present as many defenses as he had or thought he had, and this is true if he offered conflicting defenses for the express purpose of confusing the jury. However, when this is attempted he places himself in a very poor position to complain of the court's rulings on the giving and refusing of instructions. It is the duty of this court to try to see the truth,

and to see that justice is done if we can do so without establishing or approving some rule of law which, as a precedent, may work to the prejudice of some other person. We have frequently said that we will not reverse a judgment which is just and justified, for the mere purpose of trying to obtain a perfect record.

The defendant presented his own and other evidence which was well calculated to confuse a jury, and he now complains because the jury was not confused. He presented a theory of self-defense which was wholly incompatible with the facts both proved and admitted. At the same time he presented a theory that the pistol was accidentally discharged, which, if true, would totally eliminate any theory of self-defense. If he acted in self-defense he must necessarily have fired intentionally, whereas if the pistol was accidentally discharged all questions of self-defense are out of the case. He seeks thus to escape punishment by leaving the law bewildered between two inconsistent defenses thrown into one case.

Having adopted these two conflicting and totally inconsistent theories, he not only requested but actually received instructions based on each and both of them. The court refused eight instructions which were either argumentative or covered by other given instructions. Twenty-nine instructions were given, eighteen requested by the People, and eleven by the defendant. Of those given at the request of the defendant nine were based upon his theory of self-defense and one upon the theory of accident. Considering these instructions as a series and as a whole, they fully, fairly and correctly instructed the jury as to the law in the case, with the single exception of the one instruction which we criticized in *People* v. *Biella, supra.*

Objection is made to the State's attorney's argument to the jury but it is without merit. The circumstances justified the severe condemnation, and the argument was fairly based on the evidence.

It is only such errors as deny to a defendant his substantial rights or materially prejudice his case before a jury that will justify the reversal of a judgment based upon the verdict of a jury which has heard all of the evidence, (*People* v. *O'Brien,* 277 Ill. 305,) and this rule has been frequently applied even in cases where the death penalty has been imposed. (*People* v. *Murphy,* 276 Ill. 304; *People* v. *Cardinelli,* 297 id. 116; *People* v. *Haensel,* 293 id. 33; *People* v. *Anderson,* 239 id. 168.) The foregoing cases, and many others which might be cited, are authority for the statement that we will not reverse a judgment of conviction where another result might not reasonably be expected on a new trial. On the record before us, nothing short of a miscarriage of justice could produce any other judgment, or any lighter punishment than this defendant has already secured. He has presented inconsistent defenses, well calculated to confuse a court or jury, but the unexplained and unexplainable facts convict him beyond reasonable doubt. It is probably true that the deceased provoked the original altercation, but that does not help the defendant any because pursuit and killing after the deceased had abandoned the quarrel could not be self-defense. Neither would it help the position of the defendant any if we should believe his story about struggling for the possession of the gun and its accidental discharge, because he had no business on deceased's front porch threatening him with a gun. The deceased was unarmed, only partly dressed, and had retreated until his back was against his own front door where the defendant killed him and then became a fugitive from justice. The fact is the defendant is guilty of murder, has had a fair trial, which was free from prejudicial error and has received a very mild punishment. We can see no reason for reversing the judgment against him, and it is affirmed.

*Judgment affirmed.*