(No. 76837

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. CHARLES LANDWER, Appellee.

*Opinion filed May 18, 1995.—Rehearing denied October 2, 1995.*

BILANDIC, C.J., joined by McMORROW, J., dissenting.

Roland W. Burris, Attorney General, of Springfield, and James E. Ryan, State's Attorney, of Wheaton (Norbert J. Goetten, William L. Browers and Mary Beth Burns, of the Office of the State's Attorneys Appellate Prosecutor, of Elgin, of counsel), for the People.

G. Joseph Weller, Deputy Defender, and Paul J. Glaser, Assistant Defender, of the Office of the State Appellate Defender, of Elgin, for appellee.

JUSTICE NICKELS delivered the opinion of the court:

Defendant, Charles Landwer, was convicted of two counts of solicitation of murder for hire in a jury trial in Du Page County. (720 ILCS 5/8—1.2 (West 1992).) He was sentenced to two concurrent terms of 20 years' imprisonment. The appellate court reversed defendant's convictions, finding error on two points. (254 Ill. App. 3d 120.) First, the appellate court found that defendant was entitled to have the jury instructed concerning solicitation to commit aggravated battery, as a lesser included offense of solicitation to commit murder. Second, the appellate court found that the prosecutor misstated the law during closing arguments. We granted the State's petition for leave to appeal. (145 Ill. 2d R. 315(a).) For reasons that follow, we reverse.

## BACKGROUND

Defendant owned an automobile repair business. Defendant was convicted of soliciting the murder of two of his former employees, Aric Cherim and James Haliotis. As part of his duties, Cherim assisted the defendant in "repossessing" cars. Cherim became convinced that the repossessions were actually thefts and reported the activities to the Du Page County State's Attorney's office. The Du Page County State's Attorney's office conducted an investigation that culminated in a 36-count indictment charging the defendant with various automobile offenses.

Upon learning that Cherim had spoken to the State's Attorney's office, defendant testified, he decided to attempt to silence Cherim in order to prevent his further cooperation with the investigation. Also at this time, de-

fendant apparently became angry with Haliotis for allegedly stealing tools from defendant's shop and sending defendant threatening letters. Defendant admitted that he talked with a man known as "Barbecue Jerry" about securing someone to frighten or injure Cherim.

The State's Attorney's office became aware of defendant's plans from Chris Bowden. Chris Bowden also worked with defendant repossessing cars. Bowden testified that after defendant was arrested in connection with the car thefts, defendant asked Bowden whether he "had a problem with Aric [Cherim] being taken out." At that time, Bowden told defendant that he did not want to talk about the subject. Further, Bowden testified that several days later defendant again brought up Cherim and expressed his intention to "get him." As a result of these and other comments, Bowden became frightened and contacted the Du Page County State's Attorney's office.

Defendant continued to make threats concerning Cherim in Bowden's presence. Bowden testified that defendant told him that Cherim "was a dead man, just like anybody else who talks." Defendant told Bowden that he had some friends "working on it, and when Aric isn't looking over his shoulder, he is going to hit him." Defendant further asked Bowden to befriend Cherim so that the police would not suspect Bowden if Cherim "had an accident." Bowden subsequently consented to assist in eavesdropping of phone calls with the defendant.

Lori Chassee from the Du Page County State's Attorney's office secured an eavesdropping order. Chassee then assisted Bowden in tape recording a series of telephone calls that Bowden made to defendant. During an initial tape-recorded conversation, defendant referred to a man known as "Barbecue Jerry" who had "some friends who could help some friends have a change of

attitude." In a subsequent tape-recorded conversation, defendant again referenced Barbecue Jerry and stated:

"LANDWER: Well, he's got some people who are going to, you know, turn—change people's mind, you know, did you ever steal a cookie when you were small and your mother slapped your hand?

BOWDEN: Right.

LANDWER: Well, that's exactly what's gonna happen."

After these initial conversations, Bowden was instructed to discredit Barbecue Jerry and attempt to convince defendant to hire Robert Holguin, an investigator with the De Kalb police department, as his "hit man." Bowden then had the following conversation with defendant concerning Holguin:

"LANDWER: Ask [Jerry] when he's gonna do it and you and me will be at the church with the nuns, praying.

BOWDEN: Right, but here's the thing, Chuck, but I think Jerry will fuck this thing up. You know like he is a fucking bum. Like my ass is on the line with this, too, you know? I got like a concern.

LANDWER: Well do you have someone better? Yeah, our concern is to, as they say, shut the radio off as soon as possible.

BOWDEN: Well, you know, yeah, I guess, I do, you know what I mean, if I'm gonna, if this is gonna happen, you know, I know this dude like who I trust a lot more in getting the job done a hell of a lot more than Jerry.

LANDWER: O.K. What kind of dollar figure?

BOWDEN: I don't know. He is a bad ass, like he ain't gonna come cheap, like he is an enforcer for the 'Kings,' you know, he like collects debts on gambling and shit and ***

LANDWER: You see, Jerry knows somebody who will take a baby out of a stroller and smash it on the ground for $100.00, you know what I'm saying?

BOWDEN: Well this guy [Holguin] will probably come through, you know? Well what do you want to do? This guy makes people gone, like that's what we're talking, right?

LANDWER: I thought a severe beating would be sufficient because then if it ever filtered down to us.

BOWDEN: I want to track down Aric.

LANDWER: We'd like to see seven days in the nice hospital.

BOWDEN: In the next seven days?

LANDWER: No, we'd like to see them spend seven days in the hospital.

BOWDEN: Oh, O.K., I see.

LANDWER: You know a couple of broken legs is fine, something you can't you know [sic].

BOWDEN: Well, I was thinking.

LANDWER: Uh, you were unless you want to have it gone, that would be fine, too.

BOWDEN: Well, that's what I assumed, I mean.

LANDWER: I would lose no sleep over it, would you?

BOWDEN: No, no.

* * *

LANDWER: Yeah, call the guy, get the story, and then if he wants like a nickel [$500] apiece, yeah, we can do that.

BOWDEN: That's probably what he'll want.

LANDWER: That's no problem, I mean, he'll get the job done.

BOWDEN: Yeah, I'm like pretty confident. I wouldn't have told you about it if I didn't think so.

LANDWER: Gone might be better.

BOWDEN: What's that?

LANDWER: Gone might be good.

BOWDEN: Well, that's kind of like what this guy does, I mean, that's what I, you know, mean that's my motivation for getting him.

LANDWER: All I think is that this has got to come to a grinding halt. The stories have to be stopped today."

Bowden subsequently called defendant to make arrangements for defendant to meet Holguin and give him the money. The defendant reluctantly agreed to the meeting, after Bowden explained that Holguin would only take the job if defendant met him personally. Holguin, wearing a wire, met the defendant at a fast-food restaurant and the following conversation ensued:

"HOLGUIN: O.K. Well, I mean, what kind of an end do you want?

LANDWER: Whatever you feel comfortable, you know, you know. Whatever you think is a *** (inaudible).

HOLGUIN: Well, you know. I'll tell you. You're paying for it man, I mean, you're the one, I mean, this guy's gonna be pissed off cause, you know, you bang him up a little. Is he gonna, is it gonna piss him off more, I mean, what do you want?

LANDWER: I don't know.

HOLGUIN: What do you want, I mean.

LANDWER: What do you think, Chris? What do you think? Put an end to this problem once and for all?

BOWDEN: I thought that was your understanding. You know, that's kind of what I led him to believe.

LANDWER: That's fine.

\* \* \*

HOLGUIN: O.K. The problem is, what do you want done, I mean.

LANDWER: Well, I mean, what do you think it will take to keep the kid quiet? What do you think, Chris, do you just want to get rid of it?

BOWDEN: Well you talked, that's what I assumed you were talking about.

LANDWER: I think that's the best and the least problems.

\* \* \*

HOLGUIN: You know, obviously it's a lot easier to just hit him. I mean, it depends on what you want.

LANDWER: That's probably the best, just—

HOLGUIN: You know, you, know, they find him, you know, you know, he got somebody pissed, you know, he got in a fight somewhere, boom, somebody just, you know, just blew him away or something.

\* \* \*

HOLGUIN: So you want him dead?

LANDWER: If the story stops, we'll know quick enough if the stories stop, you know what I'm saying.

\* \* \*

HOLGUIN: O.K. So what do you want done with this guy, obviously, do you want a broken leg, I mean do you want me to shoot him, or what? Once in the head, what? I don't want no misunderstandings, guy, O.K.? Cause I don't want you to come back later at me, well, not, I just, you know, wanted this guy hurt. I mean, tell me exactly what you want.

LANDWER: Do you think it's gonna solve our problems, Chris? Yes or no?

BOWDEN: A hurt body still has lips.

LANDWER: Yeah, see, I think that will just piss him off more. What do you think?

HOLGUIN: Well, my experience is yeah, you know, then he's gonna really be pissed off at you, but it's up to you.

LANDWER: I mean, the kid goes ... four-wheeling, the kid goes places, you follow the kid around for a half, a couple of hours, I mean, you know.

HOLGUIN: Well, O.K. That's fine. I mean, but what do you need done? What do you exactly want done to him?

LANDWER: Shut the kid up somehow, shut him up and be done with it. I don't care whatever it takes, he keeps telling story after story.

HOLGUIN: Do you never want him to talk again?

BOWDEN: Why is this so weird? I mean, isn't this what we talked about on the phone, Chuck?

LANDWER: Yeah, just do that. Finish the kid and be done with it, O.K.? That's the best."

Defendant and Holguin also discussed Haliotis. Defendant provided Holguin with a description of Haliotis, a description of his vehicle, and his work address and phone number. Defendant and Holguin agreed that defendant would pay $600 for each job. Defendant agreed to pay $300 for each job in advance and $300 more after the work was completed. Defendant made one advance payment of $300 for the attack on Cherim. The following day, defendant again met Holguin and made a second advance payment of $300 for the attack on Haliotis. At this time, Holguin gave a signal to officers who

were monitoring the conversation over Holguin's wire and defendant was arrested.

Defendant was indicted on two counts of solicitation of murder for hire. (720 ILCS 5/8—1.2 (West 1992).) At trial, defendant raised the defense of entrapment. (See 720 ILCS 5/7—12 (West 1992).) Defendant testified that Bowden originated the idea of murdering Cherim during their taped phone conversation. Defendant testified he first thought that such a plan was extreme and unnecessary. Defendant denied telling Bowden to secure a hit man and further testified that he only agreed to a meeting with Holguin because Bowden insisted. Defendant admitted that he at last developed the intention to have Cherim and Haliotis murdered after speaking with Holguin.

Bowden also testified at defendant's trial. Bowden testified that defendant originated the idea to have Cherim murdered during meetings that occurred at defendant's automobile shop. Bowden further testified that he approached the State's Attorney's office after becoming concerned about these threats.

Jerry Raymond testified that his nickname is "Barbecue Jerry." Raymond testified that he called defendant in November or December of 1990 for the purpose of securing a loan. Raymond further testified that, during this conversation, defendant asked him if he knew anybody that could "rough up a couple punks." Raymond said that such talk was just "street talk" and he was never asked to act on the request.

Amy Gillette, a friend of both defendant and Bowden, also testified. Gillette testified that Bowden told her that "he was going to get everything he could out of [defendant] before Chuck was put away" and that "information is the best thing to have against someone." Gillette testified that defendant never told her that he wanted anyone murdered, but did tell her that Cherim

was going to have "a real bad accident." Gillette admitted that she and a friend made an anonymous phone call to the Du Page County State's Attorney's office asking that they give Cherim police protection because she believed he was in danger.

During closing arguments, the prosecutor made several references to defendant's entrapment defense. Defense counsel objected to the references, arguing that the prosecutor had misstated the law. Additional facts concerning the prosecutor's comments will be presented as necessary to address the issues presented on appeal.

At the close of the trial, the jury was instructed concerning the defense of entrapment. Defendant also tendered a jury instruction concerning solicitation to commit aggravated battery, on the theory that it was a lesser included offense. The State argued against the lesser included offense instruction on the theory that such an instruction was inconsistent with defendant's entrapment defense. The State argued that it is inconsistent to admit all the elements of the greater offense as is required to plead entrapment, and ask for an instruction concerning a lesser included offense. The trial judge agreed with the State and denied the instruction.

During jury deliberations, the jury sent a note requesting a definition of the word "originated." The judge refused this request. The jury then requested a dictionary, and that request was also refused. The jury found defendant guilty of two counts of solicitation of murder for hire. The trial court sentenced defendant to two concurrent terms of 20 years' imprisonment.

A divided appellate court reversed defendant's convictions and remanded for a new trial. (254 Ill. App. 3d 120.) The majority found that the trial court erred in refusing defendant's instruction concerning solicitation of aggravated battery. The majority reasoned that the

solicitation occurred over a series of conversations and the "same facts" were relevant to determining whether defendant committed either crime. (254 Ill. App. 3d at 134.) In addition, because it is impossible to murder someone without harmfully touching them, the majority found that the intent to batter is implicit in the intent to murder. (254 Ill. App. 3d 120.) The majority also found reversible error in statements made by the prosecutor during closing arguments concerning the entrapment defense. 254 Ill. App. 3d at 129.

The dissenting justice believed that the trial court properly refused the instruction. (254 Ill. App. 3d at 135 (Doyle, J., dissenting).) The dissenting justice reasoned that, although solicitation to commit aggravated battery was a lesser offense, it was not an included one because it was based on a different act. (254 Ill. App. 3d at 137 (Doyle, J., dissenting).) In addition, the dissenting justice argued that tendering a lesser included offense instruction is inconsistent with the defense of entrapment. (254 Ill. App. 3d at 136 (Doyle, J., dissenting).) Finally, the dissenting justice disagreed with the finding that the prosecutor's comments during closing arguments amounted to reversible error. 254 Ill. App. 3d at 137 (Doyle, J., dissenting).

We granted the State's petition for leave to appeal (145 Ill. 2d R. 315(a)).

## ANALYSIS

### I

We first address whether defendant was entitled to have the jury instructed regarding solicitation to commit aggravated battery, as an included offense of solicitation to commit murder. As a general principle, a defendant may not be convicted of an offense for which the defendant has not been charged. (*People v. Novak* (1994), 163 Ill. 2d 93.) However, in appropriate cases, a

defendant is entitled to have the jury instructed concerning less serious offenses that are included in the charged offense. (See *People v. Bryant* (1986), 113 Ill. 2d 497, 503.) Such a practice provides an important third option to a jury which, believing that a defendant is guilty of something, but uncertain whether the charged offense has been proved, might otherwise convict rather than acquit the defendant of the greater offense. *Keeble v. United States* (1973), 412 U.S. 205, 212-13, 36 L. Ed. 2d 844, 850, 93 S. Ct. 1993, 1997-98.

An included offense "[i]s established by proof of the same or less than all of the facts or a less culpable mental state (or both), than that which is required to establish the commission of the offense." (720 ILCS 5/2—9(a) (West 1992).) In applying this definition to determine whether a particular offense is included in a charged offense, this court has held that the proper approach is to examine the charging instrument and the evidence presented at trial. (*Novak*, 163 Ill. 2d 93.) First, a court must determine whether the charging instrument contains a " 'broad foundation' " or " 'main outline' " of the lesser offense. (*Novak*, 163 Ill. 2d at 107, quoting *People v. Bryant* (1986), 113 Ill. 2d 497, 505.) Second, a court must examine the evidence presented at trial to determine whether a jury could rationally find the defendant guilty of the lesser offense, but acquit on the greater offense. (*Novak*, 163 Ill. 2d at 108.) This court has not previously commented on how the entrapment defense affects a defendant's right to have a jury instructed concerning any included offenses. Whether a charged offense encompasses an included offense is a matter of law which we review *de novo*.

Applying the considerations discussed, we must first determine whether the charging instrument provides a main outline of the included offense such that the included offense may be proved by the same facts or a

less culpable mental state. The charging instruments in the present case provide:

"CHARLES H. LANDWER committed the offense of SOLICITATION OF MURDER FOR HIRE, in that said defendant with the intent that the offense of First Degree Murder, in violation of Illinois Revised Statutes Chapter 38, Section 9—1(a)(1), be committed, procured another, Robert Holguin, to commit that offense pursuant to an agreement whereby Robert Holguin would kill [count I Aric Cherim; count II, James Haliotis], and Charles Landwer would pay Robert Holguin $600.00 United States Currency."

These instruments provide the necessary main outline or broad foundation of a charge of solicitation to commit aggravated battery. These instruments describe an act of solicitation, and those same facts could encompass the act of solicitation that would be the basis of an included charge of solicitation to commit aggravated battery, namely, that Charles Landwer procured Robert Holguin to commit an aggravated battery on each victim in exchange for $600.

Further, we agree with the appellate court that the specific intent to solicit an aggravated battery is a less culpable mental state than the specific intent to solicit a murder. (*Cf. People v. Dugas* (1923), 310 Ill. 291, 300 (finding that aggravated battery is an included offense of murder).) Therefore, solicitation to commit aggravated battery can be proved by the same facts and a less culpable mental state than solicitation to commit murder under these indictments.

The second step in analyzing the propriety of an included offense instruction is to examine the evidence presented at trial to determine whether a jury could rationally find the defendant guilty of the lesser offense, but acquit on the greater offense. (*Novak*, 163 Ill. 2d at 108.) In an appropriate case, the evidence presented at trial could rationally support a finding that a defendant was guilty of solicitation to commit aggravated battery,

but not solicitation to commit murder. For example, where there is conflicting testimony, perhaps based on ambiguous language, regarding whether a defendant intended that the victim be murdered or only injured, the evidence could support either offense. This is because there is a disputed factual element that distinguishes the greater offense from the lesser offense, namely, the defendant's intent. (See *Novak*, 163 Ill. 2d at 108; *People v. Cramer* (1981), 85 Ill. 2d 92, 98.) Therefore, a defendant could be entitled to an instruction regarding the included offense of solicitation to commit aggravated battery where entrapment is not at issue.

After the entrapment defense is raised, however, the nature of the inquiry changes. As stated, an included offense "[i]s established by proof of the same or less than all of the facts or a less culpable mental state (or both), *than that which is required to establish the commission of the offense.*" (Emphasis added.) (720 ILCS 5/2—9(a) (West 1992).) We find this language to be dispositive because "that which is required to establish the commission of the offense" changes drastically after the defendant tenders an entrapment defense.

In order to prove that a defendant committed the offense of solicitation of murder for hire, the State must establish that defendant procured another to commit a murder with the intent that the offense of first degree murder be committed. (720 ILCS 5/8—1.2 (West 1992).) However, in order to rely on the defense of entrapment, a defendant must admit to committing all the elements of the charged offense. (*People v. Gillespie* (1990), 136 Ill. 2d 496.) The State must then prove beyond a reasonable doubt that the defendant was not incited or induced by a public employee or an agent of a public employee to commit the offense. 720 ILCS 5/7—12 (West 1992); see Illinois Pattern Jury Instructions, Criminal, No. 24—25.04 (2d ed. 1981).

Therefore, the sole remaining disputed factual inquiry necessary to "establish the commission of the offense" becomes whether defendant was entrapped. There is no dispute regarding defendant's mental state because the defendant has admitted it as part of raising the entrapment defense. In addition, there can be no dispute regarding the facts necessary to support any other element of the crime for the same reason.

As such, the defendant is not entitled to a jury instruction concerning solicitation of aggravated battery as an included offense of solicitation of murder. There is no disputed factual element that distinguishes the greater offense from the lesser offense after the entrapment defense is raised. Therefore, a jury could not rationally find the defendant guilty of the lesser offense, but acquit on the greater offense. See *Novak*, 163 Ill. 2d at 108.

Moreover, after the entrapment defense is raised, the lesser offense of solicitation of aggravated battery does not meet the definition of an included offense. This is because solicitation to commit aggravated battery may no longer be established by proof of the same facts or a less culpable mental state than solicitation to commit murder. (See 720 ILCS 5/2—9(a) (West 1992).) Stated another way, the same facts that are relevant to prove defendant was entrapped into solicitation of murder do not establish that he solicited an aggravated battery.

We therefore find that defendant is not entitled to an instruction regarding solicitation of aggravated battery as an included offense of solicitation to commit murder. Although solicitation to commit aggravated battery may be an included offense of solicitation to commit murder in an appropriate case, such is not the case after a defendant raises an entrapment defense.

Defendant argues that there is nothing inconsistent in admitting the elements of the greater offense and

also tendering a lesser included offense instruction. Defendant essentially argues that in addition to raising an entrapment defense to the charged crime of soliciting Robert Holguin to murder his employees for $600 each, he is entitled to provide the jury with another option, namely, that he solicited Robert Holguin or Barbecue Jerry to commit an aggravated battery at some other time. We do not agree that a defendant is entitled to raise as a defense to one charged transaction that he or she committed some separate uncharged transaction, occurring on different days and involving different participants.

The appellate court majority rested its conclusion that the trial court erred in refusing the included offense instruction in part on the fact that the State presented "volumes" of evidence concerning defendant's attempt to solicit an aggravated battery. The State presented this evidence to prove the defendant was predisposed to commit solicitation of murder and therefore not entrapped. The State's introduction of this evidence does not lead to the conclusion that solicitation of aggravated battery is an included offense of solicitation to commit murder. The State was not required to prove the fact that the defendant solicited an aggravated battery in order to establish the offense of solicitation of murder. Therefore, those facts are extraneous to the lesser included offense determination.

In passing, we question the assertion that the State presented "volumes" of evidence regarding defendant's solicitation of an aggravated battery. The State did present evidence that the defendant discussed with Jerry Raymond an intention to have the victims beaten. However, there was no evidence presented showing that the defendant ever actually requested or encouraged that the beating take place. Even if the jury believes that such a request took place, defendant fails to explain

how soliciting Jerry Raymond to commit an aggravated battery on the victims is a lesser included offense of soliciting Robert Holguin to murder them.

Similarly, in the tape-recorded conversations, defendant sometimes vacillated between expressing an intention to have the victims beaten and having the victims murdered. However, defendant only entered into one agreement with Holguin. In that agreement, defendant admitted he solicited the murder of both victims. Contrary to the appellate court's assertion, there was actually very little evidence to support a finding that an actual solicitation of an aggravated battery ever took place. Instead, a fair comment on the evidence is that defendant discussed both an intention to have the victims beaten and one to have them murdered, but actually solicited only their murders.

The analysis presented in the dissent is not persuasive because it ignores both the facts alleged in the indictment and the concept of an included offense. The dissent claims to recognize that an offense is included in a charged offense only where the facts in the indictment contain a broad foundation or main outline of the included offense. Here, the facts alleged in the indictment involve an agreement between defendant and Robert Holguin to commit murder for $600. Thus, the main outline of the included offense must involve those same general facts.

Conspicuously absent from the dissent is any indication of when and where the defendant solicited an aggravated battery. As the dissent does not identify where that solicitation took place, the dissent is able to ignore the question of whether the charging instrument contains a broad outline of that offense. If the dissent is suggesting that the procurement took place at some other time or involved some other participants, then that procurement is for a separate crime. Such does not

meet the definition of an included offense because the indictment does not present any outline or foundation for that crime.

Also puzzling is the dissent's confusion regarding the significance of the agreement alleged in the indictment. The significance of the facts surrounding the agreement is that it identifies the charged transaction. Although a specific agreement is not necessary for an act of solicitation, such an agreement is sufficient to support that charge.

In closing, we note that the dissent also misapprehends the significance of the *Gillespie* decision to our analysis today. As previously stated, a defendant could be entitled to a lesser included offense instruction under this indictment where there is some evidence that the defendant entered into that agreement with the intention only that the intended victims be beaten. In such a case, the defendant's intent is a disputed fact that distinguishes both crimes. In addition, both crimes are proved by essentially the same facts. More importantly, the facts in the indictment contain the necessary main outline or broad foundation of the lesser offense.

However, here there is no disputed element that distinguishes the two crimes after the entrapment defense is raised. The sole difference between solicitation to commit aggravated battery and solicitation to commit murder is the defendant's intent. As *Gillespie* requires the defendant to admit his intent to solicit murder in order to rely on the entrapment defense, there can no longer be any question of defendant's intent.

Therefore, conceptually, there are only two possible verdicts concerning defendant's sole act of solicitation identified in the indictment. Defendant was either guilty of solicitation of murder or he was not guilty on the basis of entrapment. To allow defendant to be convicted of solicitation of battery after raising the entrapment

defense is to assert that he may both have an intention to solicit murder and an intention to solicit battery at the same time and during the same act. This is clearly inconsistent and impossible. Therefore, a jury could not rationally acquit defendant of the greater charge and convict on the lesser.

## II

In reversing defendant's convictions for solicitation of murder, the appellate court majority also found reversible error in certain statements made by the prosecutor during closing arguments. (254 Ill. App. 3d at 129.) Prosecutors are afforded wide latitude in closing argument, and improper remarks will not merit reversal unless they result in substantial prejudice to the defendant. (*People v. Pittman* (1982), 93 Ill. 2d 169, 176.) In making this determination, a court should consider the context of the language used, its relationship to the evidence, and its effect on the defendant's right to a fair trial. (*People v. Pasch* (1992), 152 Ill. 2d 133, 185.) After reviewing the prosecutor's remarks, we find that no reversible error occurred.

The appellate court found error in the following statements made by the prosecutor during closing arguments:

"MR. KAYNE: And the Judge will instruct you, however, the Defendant was not entrapped if a public employee and/or agent of a public employee merely afforded to the Defendant an opportunity or facility for committing an offense in furtherance of a criminal purpose which the Defendant originated.

Now, what is the criminal purpose in this case? The criminal purpose is the Defendant to shut up, to make it come to a grinding halt. That is his purpose. His method is either will be a severe beating or to kill them. But the criminal purpose originated with the Defendant.

It is an offense to give a witness a severe beating; it is an offense to kill him.

MR. FAWELL: Objection, a misstatement of the law.

THE COURT: The objection is overruled.

MR. KAYNE: Either way you take it, even if you give the Defendant every benefit of the doubt, the idea originated with him. The criminal purpose of all the Defendant's actions was to escape his responsibility, was to shut the witnesses up. That was his purpose, you know it."

Relying on this passage, the appellate court found that the prosecutor erroneously argued to the jury that the "criminal purpose" sufficient to disprove the entrapment defense could be the criminal purpose either to beat the victim or to murder the victim. (254 Ill. App. 3d at 129.) The appellate court further took issue with the prosecutor's characterization of defendant's "criminal purpose" to silence the witnesses and escape criminal responsibility. 254 Ill. App. 3d at 130.

We agree with the appellate court that the prosecution was required to prove that the defendant originated the criminal purpose to have the intended victims murdered in order to disprove the entrapment defense. We also agree that at times the prosecutor confused the concept of defendant's criminal purpose with defendant's motive. However, after a review of the prosecutor's comments as a whole, we find that the prosecutor stopped short of arguing that any criminal purpose possessed by the defendant was sufficient to overcome the entrapment defense. Instead, the thrust of the prosecutor's argument was a proper comment on the evidence.

As stated, a reviewing court must consider comments in relation to the evidence. (*Pasch*, 152 Ill. 2d at 184.) Defendant admitted that he discussed having Cherim frightened or beaten before any inducement from the State. Defendant also admitted to arriving at the intention to have Cherim and Haliotis murdered after talking to Robert Holguin in the fast-food parking lot. After raising the entrapment defense, the sole

remaining disputed issue was whether defendant originated the criminal purpose of having the intended victims murdered. (*Gillespie*, 136 Ill. 2d 496.) The thrust of the prosecutor's argument was that because defendant discussed having Cherim injured or frightened before any involvement by the State, it makes it more likely that he also originated the criminal purpose to have the witnesses murdered. This is an entirely proper comment on the evidence.

The appellate court took certain of the prosecutor's statements out of context, thereby failing to recognize the nature of the prosecutor's argument. For example, the appellate court extracted the following sentence as an example of the prosecutor's misstating the law of entrapment:

> "[T]he judge will instruct you that induced to commit an offense, the Defendant was never induced or incited to have a severe beating done on Aric Cherim or Jamie Haliotis."

However, placed in context, this comment does not suggest a misstatement of the law. The prosecution was not arguing that defendant could not be entrapped into solicitation to commit murder because he was not entrapped into having the intended victims beaten. Instead, the prosecution was using the defendant's admitted intention to have the men beaten as evidence that he also originated the criminal purpose to have the men murdered. The following quote places the prosecutor's comments in their proper context:

> "MR. KAYNE [Assistant State's Attorney]: Third, the State has to prove that the Defendant was not entrapped. And the Judge will give you an instruction as to what—what the definition of entrapped is.
>
> He will instruct you, first, that it is a defense to the charge made against the Defendant that he was entrapped; that is, that for the purpose of obtaining evidence against the Defendant, he was induced by a public employee and/or an agent of a public employee to commit an offense.

Now, first of all, the judge will instruct you that induced to commit an offense, the Defendant was never induced or incited to have a severe beating done on Aric Cherim or Jamie Haliotis.

MR. FAWELL [Defense Attorney]: I believe this is a misstatement of the law that the State is getting into with 'an offense'—

THE COURT: I don't believe that is a misstatement. Overruled.

MR. KAYNE: You will hear the instructions from the Judge. Look at it. You will have a chance when you go back to the jury room to review the instruction, and it will say that he was induced by either a public agent or an agent of a public employee, or a public employee to commit an offense.

*The Defendant was never ever induced or incited to have these men beaten. And I suggest to you he was never ever induced to have the men killed. It was his decision. He told you himself he made that decision."* (Emphasis added.)

Placed in context, the prosecutor's comments were a proper comment on the evidence. The prosecutor was arguing that defendant's admitted intention to have the intended victims beaten is some evidence that he also originated the intention to have those same men murdered.

In other comments not cited by the appellate court, the prosecutor makes reference that the defendant must have originated the criminal purpose to have the victims murdered. We acknowledge that the prosecution again confuses defendant's motive to silence the witnesses with the applicable criminal purpose to have the witnesses murdered. However, the prosecutor does not argue that the criminal purpose sufficient to disprove the entrapment defense could be the criminal purpose to have the intended victims either beaten or murdered. Instead, the prosecutor correctly argues that the defendant was not entrapped if the State merely af-

forded the defendant an opportunity to commit a crime in furtherance of a criminal purpose he originated:

"MR. BAYER: The other count in this case, Jamie Haliotis, number one, I don't think any of you can quite figure out why he is a target and why someone paid to have him killed, but the Defendant did it. And his explanation for that one was, well, Bob Holguin originated that idea, and you know by definition that Bob never meet [*sic*] him until January 3rde [*sic*]. And you heard the testimony, and you can hear on the tapes it is the Defendant that brings up there are two.

And Bob said, there are two? Yeah, I want to take care of Jamie, too, or words to that effect. So again he is impeached by his own testimony about where this origin of the idea to kill somebody came up.

And keep in mind what we are talking about is that the criminal purpose originated from the Defendant. And the criminal purpose here is to shut up a witness. And he may start out saying that I want him roughed up, but if that is his purpose and he originates it, not the State, and the State merely affords him the opportunity, *down the line after he weighs it in his mind and makes the decision, he says, well, better yet, kill—*

MR. FAWELL: Objection; that is a misstatement of the law.

THE COURT: I don't know that that word was used. The jury has heard the evidence.

MR. BAYER: The point is that his criminal purpose is to shut someone up. *At first he talks about beating someone up and ultimately decides that what he will do is kill someone. He has not been entrapped.*

MR. FAWELL: Objection.

MR. BAYER: The criminal purpose originated with him.

THE COURT: Overruled." (Emphasis added.)

We find this argument to be a proper application of the law to the facts.

Although we find the preceding arguments proper, we agree that the prosecutor misstated the law in the following passage:

"MR. BAYER [Assistant State's Attorney]: The Defendant has admitted he committed the crime. And the only way you can find him not guilty is if you avail him of the legal defense and decide that his criminal purpose did not originate with him, and that by his own [sic] overbearing action on behalf of the State, they incited and induced and planted in an innocent man this idea of beating someone up or killing someone.

MR. FAWELL: Objection.

THE COURT: 'Killing someone'—objection is sustained as to the form of that."

We agree that the prosecutor mistakenly implied to the jury that the defendant was not entrapped if he originated the idea of beating the intended victims. This is an incorrect statement because the defendant may have originated the idea to have the intended victims beaten, but only formed the criminal purpose to have them murdered after interference from the State. However, we find that this error does not require reversal of defendant's convictions.

As stated, improper remarks by the prosecution will not merit reversal unless they result in substantial prejudice to the defendant. (*Pittman,* 93 Ill. 2d at 176.) We first note that defense counsel neither specified the nature of the objection nor asked the court for an admonition to the jury to disregard or clarify the misstatement after the objection was sustained. Such a general objection is considered insufficient to preserve an error for review. See *People v. Caballero* (1984), 102 Ill. 2d 23, 41; see also *People v. Barrios* (1986), 114 Ill. 2d 265, 275 (finding that specific objection is a waiver of all other grounds not specified).

Moreover, for reasons that are not entirely clear from the record, the trial judge sustained the objection. The appellate court majority believed that the judge erroneously sustained the objection because of the use of the word "killing." (254 Ill. App. 3d at 131.) In contrast, the dissent believed that the trial judge correctly

sustained the objection and corrected the prosecutor by informing the jury that the defendant must have originated the idea of "killing someone." (254 Ill. App. 3d at 138 (Doyle, J., dissenting).) Ambiguity aside, the fact remains that the trial judge sustained defense counsel's objection and thereby reduced the prejudicial effect of any misstatement. *People v. Jones* (1993), 156 Ill. 2d 225, 249-50; *People v. Morgan* (1986), 112 Ill. 2d 111, 135.

In a clear case, where necessary to protect a defendant's right to a fair trial, this court has found reversible error in counsel's improper conduct even where the trial court has sustained objections, rebuked counsel, and directed the jury to disregard the comments. (*People v. Polenik* (1950), 407 Ill. 337, 345-46.) After considering the context of the statement and its relation to the evidence, we cannot say that the statement denied defendant his right to a fair trial. Defendant admitted that he originally intended to have Cherim frightened or beaten in order to prevent his cooperation with the car-theft investigation. The State could legitimately argue that defendant originated the criminal purpose to have both men murdered for the same reason. Furthermore, the State presented compelling evidence in the form of the taped conversations and courtroom testimony that the defendant was predisposed to commit the offense. To the extent that any prejudice occurred, it was cured by sustaining the defendant's objection and properly instructing the jury at the close of the evidence regarding the law of entrapment.

## CONCLUSION

The judgment of the appellate court granting defendant a new trial is reversed. In the appellate court, defendant also argued that the trial judge committed reversible error in failing to clarify to the jury the word "originated" in the entrapment instruction. The appel-

late court did not reach this argument. We therefore remand this case to the appellate court for resolution of this issue. See *People v. Linscott* (1986), 114 Ill. 2d 340, 349.

*Appellate court reversed;*
*cause remanded.*

CHIEF JUSTICE BILANDIC, dissenting:

I respectfully dissent. The appellate court correctly determined that the defendant is entitled to a new trial on the bases of both the trial court's refusal to give the lesser included offense instruction and the prosecutor's prejudicial misstatements in closing argument.

The majority opinion erroneously concludes that the trial court was correct in refusing the defendant's lesser included offense instruction. The majority concedes that, generally, solicitation to commit aggravated battery is a lesser included offense of solicitation to commit murder. However, the majority determines that solicitation to commit aggravated battery "ceases" to be an included offense of solicitation to commit murder when the entrapment defense is raised. I disagree. The majority's conclusion is neither required nor just.

As the majority notes, the analysis of whether a "lesser included offense" instruction is appropriate requires an examination of: (1) whether the charging instrument contains a "main outline" for the lesser offense, and (2) whether, under the evidence presented at trial, the jury could rationally find the defendant guilty of the lesser offense but acquit on the greater offense. (*People v. Novak* (1994), 163 Ill. 2d 93, 107-08.) The majority purports to adhere to the requirement of looking to the evidence presented at trial in determining whether the lesser included offense instruction is warranted. (166 Ill. 2d at 487-88.) However, the majority's ultimate conclusion is totally inconsistent with such an analysis. The majority's decision is based, not upon an

analysis of the evidence, but upon an unwarranted and illogical interpretation of the effect of this court's decision in *People v. Gillespie* (1990), 136 Ill. 2d 496.

In *Gillespie*, this court held that a defendant who denied committing an offense may not raise the defense of entrapment. The majority here reasons that because a defendant raising entrapment must, under *Gillespie*, admit the offense, the defendant is no longer entitled to an instruction on a lesser included offense. According to the majority, it would no longer be possible for the jury to rationally find the defendant guilty of the lesser offense but acquit on the greater offense.

I note, parenthetically, that I question the continued adherence to the holding of *Gillespie*. I find persuasive the argument espoused by the United States Supreme Court, and the lower Federal courts, that a defendant should be allowed to deny the commission of the charged offense but nevertheless raise the defense of entrapment. (*Mathews v. United States* (1988), 485 U.S. 58, 99 L. Ed. 2d 54, 108 S. Ct. 883.) This court has repeatedly recognized that Illinois law allows a criminal defendant to raise inconsistent defenses. (*People v. Whiters* (1992), 146 Ill. 2d 437 (where there is evidentiary support for an involuntary manslaughter instruction, such an instruction is not prohibited by a claim of self-defense); *People v. Bratcher* (1976), 63 Ill. 2d 534, 540 (a defendant is entitled to the benefit of any defense shown by the evidence, even if the facts on which such defense is based are inconsistent with the defendant's own testimony).) This court's decision in *People v. Everette* (1990), 141 Ill. 2d 147, is particularly instructive in this area. In *Everette*, the court held that a defendant is entitled to an instruction on self-defense as long as there is some evidence in the record to support it, even if the defendant testifies that he *accidentally* killed the victim. In so holding, the court specifically rejected the State's assertion

that this conclusion was prohibited by the inconsistency of the two defenses, noting that the defendant had a right " 'to present as many defenses as he had *or thought he had,*' " even if those defenses conflicted. (Emphasis in original.) *Everette,* 141 Ill. 2d at 155-56, quoting *People v. Jersky* (1941), 377 Ill. 261, 267.

I agree with the observation of the Supreme Court in *Mathews* that there is no reasoned basis for subjecting the entrapment defense to a rigid consistency requirement to which other defenses are not subject. (*Mathews,* 485 U.S. at 66, 99 L. Ed. 2d at 63, 108 S. Ct. at 888.) Nevertheless, I do not find it necessary to disturb the holding of *Gillespie* at this time because *Gillespie* is not applicable to this case.

*Gillespie* held only that a defendant who denies committing the offense charged is not entitled to have the jury instructed on the entrapment defense. (*Gillespie,* 136 Ill. 2d at 501.) The reason for this rule, the court explained, is the "common sense" proposition that it would be "factually and legally inconsistent for a defendant to deny committing the offense and then to assert as a defense that he committed the offense, but only because of incitement or inducement by the authorities." *Gillespie,* 136 Ill. 2d at 501.

The majority concedes that *Gillespie* did not address the issue presented in this case, that is, how the entrapment defense affects a defendant's right to a lesser included offense instruction. I agree with the majority that this court has not yet addressed this important issue.

As the majority acknowledges, the controlling analysis in determining if the defendant here was entitled to a lesser included offense instruction, once the "charging instrument" test was passed, is whether the evidence could rationally allow the jury to find the defendant guilty of the lesser offense, while acquitting him of the

greater offense. (166 Ill. 2d at 486.) This was entirely possible under the evidence presented in this case. The jury could have rationally found the defendant guilty of soliciting aggravated battery, while acquitting him of soliciting murder, based upon the entrapment defense. *Gillespie* would not alter that conclusion. As noted, the basis for the *Gillespie* decision was the determination that the defendant could not assert inconsistent defenses. When the evidence in this case is analyzed, there is no legal or factual inconsistency between the defendant's assertion of the entrapment defense and the giving of the requested lesser included offense instruction. The rationale for the *Gillespie* decision is thus not present in this case, and *Gillespie*, therefore, does not apply.

The defendant's theory at trial was that he did in fact solicit the aggravated battery of the two employees. The defendant further took the position that, while he did *ultimately* formulate the intent to have the two men murdered, he did not originate that intent but, rather, it was *only the result of the persuasion of the government agents*. In other words, the defendant essentially admitted to committing the offense of solicitation to commit aggravated battery, but contended that he was entrapped into forming the intent to "elevate" the solicited act to murder.

The evidence at trial was sufficient to support the defendant's theory, in all of its aspects. The defendant's testimony and the tape-recorded conversations supported the position that the defendant solicited the aggravated battery of the men. Further, both the defendant's testimony and the tape-recorded conversations supported, strongly in my view, the position that the defendant did not originate the intent to have the men murdered, but that he was entrapped into formulating that intent.

Thus, the defendant's theory at trial was logically

and legally consistent and was supported by the evidence. It is well-established that a criminal defendant is entitled to an instruction on any defense, or lesser included offense, that has even slight foundation in the evidence. (*People v. Novak* (1994), 163 Ill. 2d 93, 109; *People v. Everette* (1990), 141 Ill. 2d 147, 156.) The defendant was therefore entitled to the requested lesser included offense instruction in this case.

I note that the majority, in what appears to be an alternative ground for its holding on this issue, asserts that there was very little evidence to support a finding that a solicitation for an aggravated battery took place. (166 Ill. 2d at 491.) The majority reasons that the defendant "entered into one agreement with Holguin," *i.e.*, to solicit murder. (166 Ill. 2d at 491.) The meaning of the majority's statement is unclear, for two reasons. The majority seems to ignore the principle that a defendant is entitled to a lesser included offense instruction as long as there is *any* evidence to support it. (*Novak*, 163 Ill. 2d at 109.) Further, the majority's assertion is not borne out by the record. The offense of solicitation requires only that the defendant have commanded, encouraged or requested another to commit an offense. (720 ILCS 5/8—1(a) (West 1992).) An actual agreement between the parties is *not* an element of that offense. (See *People v. Breton* (1992), 237 Ill. App. 3d 355, 361-62 (distinguishing solicitation, which does not require a bilateral agreement, from conspiracy, which does require a bilateral agreement).) Even considering only the excerpts from the record contained in the majority opinion, it is clear that there was enough evidence that the defendant encouraged or requested an aggravated battery to warrant the lesser included offense instruction.

The failure to give the lesser included offense instruction in this case was undeniably prejudicial to

the defendant. The trial court's refusal effectively denied the defendant any defense whatsoever. The defendant, having essentially admitted that he committed the solicitation of aggravated battery, was not allowed to have the jury consider that offense as a possible verdict, if he wished to raise the defense of entrapment. However, the entrapment defense was essential as it presented the defendant's explanation for his ultimate formulation of the intent to have the employees murdered. The defendant was thus placed into the "Catch 22" situation of having to choose one of the two positions, neither of which, standing alone, provided a full explanation of the defendant's theory. As a result, the jury was left with the options of convicting the defendant of solicitation to commit murder or acquitting him outright, even though the defendant had admitted to committing the lesser crime. Only the giving of both the entrapment and the lesser offense instructions could have given the jury the full range of options it needed to properly analyze the evidence and reach a verdict that was just.

In my view, the result reached by the majority in this case runs counter to the purpose behind the entrapment defense. The defense of entrapment evolved in recognition of the public policies that:

> "The first duties of the officers of the law are to prevent—not to punish—crime. It is not their duty to incite and create crime for the sole purpose of prosecuting and punishing it. *** There is common agreement that where a law officer envisages a crime, plans it and activates its commission by one not theretofore intending its perpetration, for the sole purpose of obtaining a victim through indictment, conviction and sentence, the consummation of so revolting a plan ought not to be permitted by any self-respecting tribunal. *** Public policy forbids such sacrifice of decency." (*In re Horwitz* (1935), 360 Ill. 313, 327.)

The majority's holding in this case leaves the government entirely at liberty to entrap persons who may be

of a mind to commit a lesser crime into committing a more serious offense, and, in the process, almost ensure itself of a conviction on the greater offense. This result does not serve to deter entrapment by government agents but, rather, rewards it.

Accordingly, I believe that the trial court committed reversible error in refusing the defendant's lesser-included offense instruction. Given that this court has repeatedly allowed a criminal defendant to raise multiple defenses which are, in fact, factually inconsistent with one another, I cannot comprehend the justification for the result reached by the majority in this case, where the defendant's two positions are perfectly *consistent*. The majority's decision is simply unjust. On this basis alone, I would remand for a new trial.

In criticizing this dissent, the majority states that I "ignore" the language of the indictment in concluding that a lesser included offense instruction was warranted. (166 Ill. 2d at 491.) May I remind the majority that, in making this criticism, the majority ignores the language of its own opinion wherein it finds that the indictment in this case did "provide the necessary main outline or broad foundation of a charge of solicitation to commit aggravated battery" (166 Ill. 2d at 487).

I also disagree with the majority's resolution of the issue of the prosecutor's misstatements in closing argument. I agree with the appellate court majority that the prosecution repeatedly misled the jury regarding the evidence necessary to disprove the entrapment defense. As the appellate court opinion fully explains, reversible error occurred when the prosecutor erroneously informed the jury on several occasions that the defendant's entrapment defense failed if the evidence showed that the defendant originated *either* the criminal purpose of beating the victims *or* the criminal purpose of murdering them. Because I believe that the appellate court ma-

jority opinion adequately addresses this issue, I will not reiterate that reasoning here.

For the foregoing reasons, I would affirm the judgment of the appellate court granting the defendant a new trial.

JUSTICE McMORROW joins in this dissent.